CHARLES R. JONES, Judge.
| ,This ease arises out of a shooting incident which occurred at 6881 Parc Brittany Court in New Orleans, Louisiana on December 23, 2001. Three individuals are alleged to have attacked Mr. Christopher McCorry, Mr. Troy Steen and Mr. Malcolm Green. Mr. McCorry was shot twice, once in the head and once in the chest. Mr. Steen was shot five times, twice in the left arm, twice in the right arm, and once in the back. Mr. Green was shot once in the right leg. Mr. McCorry died on the scene; Mr. Steen and Mr. Green survived.[1] Mr. Green and Mr. Steen gave statements indicating that there were three gunmen involved in the shooting.
Eugene Thomas and Morris Patín were originally indicted for the first degree *4 murder of Mr. McCorry on February 28, 2002. This case was allotted to Section “D” of the Orleans Parish Criminal District Court, bearing case number 428-349.
On August 30, 2002, the lead detective assigned to this case received a Crimestop-pers tip identifying a third shooting suspect as Eric McCormick. Shortly thereafter, the detective presented photographic lineups of Thomas, Patín, and McCormick to the surviving victims. Mr. Steen identified McCormick as the third shooter.
| gThereafter, on October 17, 2002, an Orleans Parish Grand Jury returned a superseding true bill of indictment, charging Thomas, Patín and McCormick with first-degree murder. The State filed the superseding indictment, and thereafter entered a nolle prosequi as to the earlier ease number 428-349.

Procedural History as to Eugene Thomas

Thomas, who at the time was represented by attorney Clyde Merritt, pled not guilty on October 24, 2002. During the first seven months following the October 17, 2002 indictment, Thomas represented in open court that he intended to present an alibi defense. The alibi of Thomas was that he was at the Lake Forest Plaza Mall at the time of the shootings. Thomas disclosed the names of Brandon Mitchell and Angelo Brown as his alibi witnesses.
On or about May 19, 2003, Thomas was notified by the State of its intention to try McCormick before jointly trying Thomas and Patín. Thomas and Patín were scheduled to proceed to trial on August 25, 2003.
Nevertheless, although the trial for McCormick was scheduled for July 21, 2003, the trial was continued to October 20, 2003. When the matter proceeded to trial as scheduled, the district court declared a mistrial two days later on October 22, 2003. At that time, the State notified Thomas and Patín that they would not be tried until McCormick’s retrial.[2]
The date set for Thomas and Patín to go to trial was February 9, 2004. However, the joint trial for both did not take place as it was continued numerous times:
[ 3— until April 26, 2004 upon joint motion;
•— until June 28, 2004 on motion of Patín;
— until August 2, 2004 on motion of Patín,
— until October 25, 2004 upon motion of the State,
— until January 24, 2005 on motion of the State,
— until March 28, 2005 on joint motion,
— until June 20, 2005 on motion of Thomas,
— until September 12, 2005 on motion of Thomas.[3]
During this period of numerous continuances, particularly on February 22, 2005, Thomas filed a pro se motion for speedy trial in this Court, which we considered as a writ application. In response to the writ application, on March 8, 2005, this Court ordered:
Relator’s writ is granted for the sole purpose of transferring his Motion for Speedy Trial for consideration prior to *5 trial or by March 28, 2005, if trial is continued, or if it has not already done so. As proof of compliance, the district court is ordered to provide this court with a minute entry evidencing the action taken.
On June 20, 2005, the district court noted that Thomas had previously moved for a continuance, and granted a continuance on the motion of Thomas over the objection of the State.
However, Hurricane Katrina struck New Orleans and the Gulf Coast region on August 29, 2005. This event stalled court operations at the Orleans Parish Criminal District Court until operations resumed on or about January 1, 2006.[4]
On June 13, 2006, the State filed a “set sheet” in order to resume the proceedings against Thomas and Patín, who were located by June 30, 2006, and transported back to Orleans Parish.
In the interim, on July 27, 2006, at a status conference, counsel for Patín informed the district court that he intended to withdraw as counsel of record. A|4new attorney enrolled three weeks later on August 15, 2006. Shortly thereafter, Thomas and Patín moved for a scheduling conference (which was scheduled for September 5, 2006). Trial was set for November 13, 2006.[5]
On the scheduled trial date of November 13, 2006, the State announced readiness for trial, but counsel for Thomas (Mr. Merritt), withdrew as counsel of record, and the district court ordered the matter continued. Nearly four weeks later, on December 11, 2006, Mr. Lewis Ungelsby enrolled as counsel of record for Thomas. A pre-trial conference was scheduled for January 17, 2007, but on that date the pretrial conference was continued until February 5, 2007, because a trial was in progress, and because of the non-appearance of Mr. Ungelsby.
At a subsequent pre-trial conference on February 5, 2007, trial was scheduled for June 25, 2007. However, on June 6, 2007, Thomas moved to continue the June 25, 2007 trial. Two weeks later, Thomas filed eight (8) applications for subpoenas duces tecum. The court set a return date of July 12, 2007, for compliance with the subpoenas.
In response to the June 6, 2007, motion to continue filed by Thomas, the district court ordered the June 25, 2007 trial date continued to November 5, 2007.
On November 5, 2007, the State announced readiness for trial, as did Thomas, but trial did not commence because counsel of record for Patín withdrew his representation. On January 7, 2008, a hearing was held to determine counsel for Patín, but the hearing was rescheduled to January 11, 2008. On January 11, 2008, Thomas filed a motion for an extension of time related to the lack of legal representation for Patín, who obtained new counsel on February 19, 2008.
IfiOn March 3, 2008, the district court, the State and the defendants held a scheduling conference in which all parties discussed the need to “get the case moving expeditiously”:
THE COURT: What’s the status, Mr. [Assistant DA]?
MR. deBLANC: Your Honor, I’ve spoken with Mr. Price who was recently appointed to represent Mr. Patín in this case, who indicates that the previ *6 ous attorney has not really turned over too much. Because of that, I’m going to be putting together a full packet of new Discovery disclosure, at least for them, and I will also provide it to Mr. Thomas’ counsel, and make sure that they have the same thing. Because of the potential need for further investigation by Mr. Price, and the fact that they are also coming out of Baton Rouge, we have selected three dates so we can get this case moving. The first date is April 17 [, 2008]. We ask that that be set for status hearing for discovery to make sure that all, that the state has turned over everything that it’s supposed to, although it should be turned over pri- or to that date.
We ask that the date of May 2 [, 2008], be set for the deadline for any additional written motions to be filed in this matter, and with the intent if there is a need for any additional motions to be held that that date be set for June 9 [, 2008]. We feel that if we do this, then we will get the case moving expeditiously.
THE COURT: Everyone’s in agreement with what counsel just stated?
MR. PRICE: Yes, sir. We’ve worked out those dates in agreement.
|fiMR. UNGELSBY: Yes, sir.
THE COURT: So ordered.
A status hearing was held on April 17, 2008. Subsequent to that date, on May 2, 2008, Patin filed several motions. The scheduled trial date of June 9, 2008, was continued because of another trial in progress. The motions on behalf of Patin were not resolved on July 22, 2008, August 19, 2008, nor November 3, 2008. However, on November 3, 2008, trial was scheduled for April 20, 2009.
Prior to the scheduled trial date of April 20, 2009, Patin again filed motions on March 10, 2009, and March 26, 2009. The scheduled date of April 20, 2009, was converted to a status conference. At that time, the bill of indictment was amended from first-degree murder to second-degree murder, and trial was scheduled for July 27, 2009.
However, eighteen days prior to the July 27, 2009 trial date, counsel for Thomas, Mr. Unglesby, withdrew as counsel of record. Then, three days prior to the July 27, 2009 trial date, new counsel for Thomas filed a motion to sever defendants. Patin followed suit and filed a motion to sever on July 31, 2009. The severance was granted several months later.[6]
After the July 27, 2009 date, several status hearings were held. Thomas filed a motion to quash the indictment on September 4, 2009, four days after Patin filed a separate motion to quash. After a hearing on the motion to quash, the district court denied the motion to quash filed by Thomas, on statutory grounds, on September 10, 2009, and on constitutional grounds on October 28, 2009.
17Thomas timely sought supervisory review of the denial of his motion to quash. This Court granted the writ application filed by Thomas, and directed the district court to hold an evidentiary hearing to consider whether the constitutional speedy trial claim filed by Thomas had merit. See, State v. Eugene Thomas, unpub. 2009-1647 (La.App. 4 Cir. 1/27/10).
On remand, the district court heard the matter on February 4, 2010, and the court granted the motion to quash only as to the constitutional right to speedy trial. The State noted its intent to appeal, and the district court stayed the release of Thomas *7 to allow the State time to file its appeal. On February 10, 2010, the district court denied the motion filed by Thomas for release pending the appeal of the State.
Thomas filed a writ application with this Court seeking review of the denial of his release by the district court. This Court granted the writ application filed by Thomas and ordered his release. State v. Thomas, unpub. 2010-0205 (La.App. 4 Cir. 2/11/10). The State filed writs of certiorari from the Supreme Court, and on February 12, 2010, the Supreme Court, in State v. Thomas, unpub. 2010-335 (La.2/12/10), reversed the order of release ordered by this Court and ordered a stay of Thomas’ release pending further orders from that Court. However, prior to the lodging of the appeal record, Thomas filed an emergency writ application in this Court, State v. Thomas, unpub. 2010-0303 (La.App. 4 Cir. 3/1/10), seeking his release from custody. Because the order of stay by the Supreme Court was in effect, this Court denied the writ application. Thomas then filed an emergency writ application in the Supreme Court, State v. Thomas, unpub. 2010-0586 (La.3/31/10, 31 So.3d 353), which was granted. The writ application of Thomas was remanded to this Court for expedited consideration with the appeal by the State. Per the | instructions of the Supreme Court, the consolidated appeal and writ application were docketed for oral argument and heard on April 28, 2010, before a panel of three judges.[7]
Subsequently, once the appeal record in the Thomas case was lodged in this Court, and the appeal by the State in the related Patin case, and given the commonality of issues presented in these two appeals, this Court ordered sua sponte that the appeals and the "writ application be consolidated and considered en banc. The consolidated cases were docketed and oral arguments were heard on June 2, 2010. Thereafter on June 17, 2010, this Court issued a Per Curiam setting forth the decree of the Court with a full opinion to follow. Judges Lombard and Belsome attached their dissent to the Per Curiam.
To date, Thomas remains incarcerated pending the resolution of the appeal filed by the State, and the consolidated writ application.
The Court notes that despite the size of the appeal record in the case involving Thomas, the facts of the offense are relatively unknown. The record contains neither any pretrial suppression hearing transcripts nor any police report other than a short one involving the arrest of McCormick, a former codefendant, now deceased.
Because the constitutional speedy trial claim filed by Thomas is based on the length of time he has been incarcerated for the present offense, see State v. Page, 95-2401 (La.App. 4 Cir. 8/21/96), 680 So.2d 700, the following is a complete chronology of the proceedings in the case against Thomas. The various docket masters and minute entries provide:
| ¡¡Docket Entries as to Eugene Thomas
Magistrate # 396048
12/27/01 First appearance; bond set; rule to show cause set for 1/8/02;
1/8/02 Rule to show cause reset 1/11/02;
1/11/02 Preliminary hearing set for 1/18/02;
1/18/02 Preliminary hearing reset to 1/25/02;
1/25/02 Probable cause found; rule to show cause set for 2/27/02;
2/27/02 Rule to show cause reset to 3/1/02.

#428-349

2/28/02 Thomas indicted for La. R.S. 14:30, First Degree Murder;
3/1/02 Case allotted to Section D;
3/6/02 Thomas (and Patin) appeared and pled not guilty; hearing to determine counsel for both set for 3/27/02;
3/27/02 Reset for a status hearing on 4/12/02;
4/4/02 Status hearing reset to 4/10/02;
4/10/02 Motion hearing set 5/10/02;
*8 5/10/02 Thomas appeared with counsel Clyde Merritt of the Orleans Indigent Defender Program; reset motions to 6/13/02;
6/13/02 Reset motions to 6/14/02;
6/14/02 More motions heard, to be completed on 7/10/02; trial 8/13/02;
7/10/02 Counsel present and motions heard; witnesses called; court denied motion to suppress; trial set 8/13/02;
7/15/02 Trial reset to 9/24/02, no indication on whose motion;
9/17/02 Trial reset to 11/12/02 on State’s motion;
9/24/02 Trial reset to 10/21/02 on State’s motion;
10/21/02 Matter set in error; trial reset to 10/23/02;
JjplO/23/02 Thomas not brought up from jail; status set 10/28/02;
10/28/02 Counsel present without defendants; status reset to 10/31/02;
10/31/02 Charges nolle prosequied as to Thomas and coindictee; case closed.

#434-092

10/17/02 Thomas indicted for La. R.S. 14:30, First Degree Murder;
10/18/02 Case allotted to Section G; arraignment set for 10/22/02;
10/22/02 Arraignment reset to 10/24/02;
10/24/02 All defendants, accompanied by counsel, pled not guilty (Mr. Merritt for Thomas); motions to be filed by 10/29/02; status set 10/31/02;
10/31/02 Court ordered State’s response by 11/18/02, rebuttal due 11/15/02; hearing set 11/15/02;
11/18/02 State filed response to motion to quash; counsel status set 11/27/02;
11/27/02 Court closed; reset 1/9/03;
1/9/03 Ruling reset to 1/27/03;
1/27/03 Trial set for 3/13/03;
2/24/03 Hearing reset on State’s motion to 3/7/03 for outstanding discovery as to all defendants;
3/7/03 State filed motion for discovery and its answers; all dates to remain in effect;
3/13/03 Scheduling conference set for 3/25/03;
3/25/03 Attorneys all present; court reset discovery conference to 4/10/03; motions for 4/15/03; pretrial hearing for 5/9/03; and trial for 5/19/03;
4/10/03 Thomas not brought up from jail; reset to 4/15/03;
4/15/03 Thomas (and coindictee) present; reset motion hearing to 5/6/03;
5/12/03 State advised all motions have been satisfied; court denied motion to sever as premature;
11,5/19/03 Trial as to Thomas set 8/25/03;
10/20/03 Thomas status set 10/21/03;
10/21/03 Status reset to 11/4/03;
10/22/03 McCormick’s trial ended in a mistrial;
11/4/03 State to proceed with trial Thomas (and coindictee) first; final pretrial set 1/30/04, trial 2/9/04;
1/30/04 Joint continuance of trial by State and Thomas (and coindictee) to 4/26/04;
4/20/04 Trial reset to 6/28/04;
4/26/04 Thomas appeared; trial reset to 6/28/04;
6/17/04 Status set for 8/2/04;
08/02/04 State granted continuance; pretrial 10/18/04 & trial 10/25/04;
10/18/04 State moved to continue; status set 10/21/04;
10/19/04 State’s continuance; reset trial to 1/24/05;
1/21/05 Matter reset on motion of Thomas (and coindictee) and State; trial 3/28/05;
3/11/05 Trial reset on Thomas’ motion to 6/20/05;
3/28/05 Reset status 3/29/05;
3/29/05 All counsel present; trial reset to 6/20/05;
6/20/05 Trial reset on Thomas’ motion to 9/12/05;
6/13/06 ADA set status hearing 6/30/06;
6/30/06 Thomas (and Patín) not present; status set for 7/27/06;
7/27/06 Status for Thomas set 8/14/06;
8/14/06 Status for Thomas set 9/5/06;
8/15/06 Scheduling conference for all defendants set 8/24/06;
9/5/06 Trial set 11/13/06;
|,⅞11/13/06 Counsel for Thomas no longer represents him (Merritt no longer employed by the now-Orleans Parish Defender office); status set 11/17/06;
11/17/06 Status hearing reset 12/11/06; New counsel (Lewis Unglesby) to appear for Thomas 11/27/06;
11/27/06 Court closed due to bomb threat; reset 12/11/06;
12/11/06 New counsel for Thomas (Unglesby) signed record; pretrial conference set 1/17/07;
1/17/07 Thomas (and Patín) not brought to court; reset 2/5/07;
2/5/07 Trial for set 6/25/07;
6/6/07 Thomas filed motion to continue trial;
6/20/07 Thomas filed applications for subpoenas duces tecum, returnable 7/12/07;
6/25/07 Trial continued to 11/5/07;
11/5/07 Thomas objected to continuance of trial (on joint motion of Patín and State);
1/7/08 Trial reset to 1/11/08;
1/11/08 Status reset to 1/17/08;
1/17/08 Trial reset to 1/25/08;
1/25/08 Trial reset to 1/28/08;
1/28/08 Status set 2/12/08;
2/12/08 Thomas’ counsel not present; continued on defense motion to 2/19/08;
*9 2/19/08 Status set 3/3/08;
3/3/08 Thomas’ (and coindictee) counsel appeared; discovery hearing for both set 4/17/08; status set 5/2/08; motion hearing set 6/9/08;
4/17/08 Discovery heard; status set as to both 5/2/08;
6/9/08 Another trial in progress; reset for motions for both defendants to 7/22/08;
7/22/08 Hearing on motions reset on State motion to 8/19/08;
|1¾8/29/08 Court closed due to Hurricane Gustav; prior dates to remain;
9/30/08 Another trial in progress; reset motion hearing to 11/30/08;
11/3/08 Trial set for 4/20/09;
3/26/09 hearing set 4/1/09;
4/1/09 State granted continuance of 4/20/09 trial; status set 4/20/09;
4/16/09 Status 4/20/09;
4/20/09 State amended indictment to 14:30.1 as to Thomas (and Patin); status set 5/18/09 and trial 7/27/09 as to both;
5/18/09 Another trial in progress; status not held; keep all dates;
7/9/09 Counsel for Thomas (Unglesby) withdrew; but the minute entry notes that Thomas waived any potential conflict, and the court ordered Unglesby to remain as counsel;
7/24/09 New counsel for Thomas (Trida Ward of OPD) appeared and filed motion to sever defendants; status set 7/27/09;
7/27/09 Another trial in progress; motion to sever reset to 7/31/09, trial set 9/14/09;
7/31/09 Status hearing set 8/7/09;
8/7/09 Motion hearing set 8/13/09;
8/13/09 Motion hearing set 9/3/09, trial 10/12/09 as to both defendants; Unglesby re-enrolled to be co-counsel with present counsel for Thomas;
8/20/09 Trial reset to 10/13/09 as 10/12/09 is Columbus Day and court would be closed;
9/3/09 Thomas filed motion to quash on statutory and constitutional speedy trial grounds; hearing on all set 9/10/09;
9/10/09 Hearing held; matter reset for evidentiary hearing 9/24/09;
9/22/09 Thomas filed motion for instanters;
9/24/09 Another trial in progress; matter continued over both defendants’ objection to 10/15/09;
J^lO/13/09 Trial date moot; keep evidentiary hearing of 10/15/09;
10/15/09 Court was closed; reset evidentiary hearing to 10/28/09;
10/28/09 Court denied motions to quash and denied evidentiary hearing; both defendants objected, granted to 11/30/09 to file writs; Thomas asked for evidentiary hearing on motion to sever, hearing set 11/19/09; trial as to both set 2/1/10;
11/19/09 Court granted Thomas’s motion to sever, State to take writs by 12/21/09; case stayed pending State’s writ; status set 12⅞1/09;
12/1/09 Thomas obtained extension of time to file writ;
1/4/10 Thomas (and coindictee) appeared; State did not take writ; reset to 1/13/10 for determination of which defendant State will try first;
1/13/10 State indicated it will try Thomas second; all dates to remain in effect;
1/29/10 This court reversed court’s ruling on motion to quash and remanded case for evidentiary hearing;
2/4/10 Court held the hearing and granted the motion to quash on constitutional speedy trial grounds.
Procedural History as to Morris Patin
Morris Patin was indicted on February 28, 2002, in case # 428-349D for the first degree murder of Christopher McCorry. He pled not guilty at his arraignment on March 6, 2002. The case was reset for determination of counsel, and Sonny Ar-mond appeared as counsel for Patin on May 10, 2002. The court held motion hearings on June 14 and July 10, 2002, and at the conclusion of the latter hearing the court denied the motions to suppress. The court set trial for August 13, 2002. Trial was reset several times after that, and on October 31, 2002, the State entered a nolle prosequi of the charges.
On October 17, 2002, in case # 434-092, the State obtained a superseding first degree murder indictment against Patin, a charge to which he pled not guilty. Mr. Armond continued to represent Patin. Mr. Merrit represented Thomas, and | ujMs. Cuccia represented McCormick. Various pretrial motions were filed on behalf of Patin. In May 2003, the court severed the trial of McCormick from that of Patin. In October 2003, the State brought McCormick to trial, which ended in a mistrial. The State then indicated that it would try Patin and Thomas after the retrial of McCormick. However, trial *10 as to Patín was reset several times, sometimes by joint motion. The final continuance prior to Hurricane Katrina reset trial to September 12, 2005.
The next setting of the case was when the State set a status hearing for June 30, 2006. Counsel for Patín withdrew and new counsel (Mr. Edwin Hawkins) enrolled. In August 2006, McCormick moved to quash the charge against him. The court granted the motion of McCormick in September 2006, and the State appealed the ruling. However, the State subsequently dismissed its appeal because McCormick died. State v. McCormick, un-pub. 2006-1489, (La.App. 4 Cir. 12/15/06).
The court set trial for Patín for November 13, 2006. On that date, counsel for Thomas (Mr. Merritt) withdrew, and the matter was reset again. When new counsel for Thomas (Mr. Lewis Unglesby of the Orleans Public Defender office) enrolled, he filed more pretrial motions. Trial was set for June 25, 2007, but then was continued to November 5, 2007. On that date, counsel for Patín (Mr. Hawkins) withdrew, and the trial was reset on joint motion by Patín and the State, over the objection of Thomas. New counsel eventually enrolled (Mr. David Price of the Baton Rouge Capital Conflict Office),[8] who filed several more pretrial motions. The matter was reset several more times, and on April 20, 2009, the State amended the indictment to charge Patín with second degree murder. Counsel for hfiThomas (Mr. Unglesby) withdrew; new counsel (Ms. Trisha Ward) enrolled in July 2009, and filed a motion to sever the trials of Thomas and Patín. The matter was reset several more times, and on August 31, 2009, Patín filed a motion to quash the indictment. Thomas filed his motion to quash on September 3, 2009. The court heard the matter on September 10, 2009, and denied the motions on their statutory grounds. The court held open the opportunity for an evidentiary hearing on the constitutional claim of Patín. On October 28, 2009, after denying the motion for an evidentiary hearing, the court denied the motion to quash, and the court set a trial date of February 1, 2010. Patín objected and noted his intent to seek writs, and the court granted him until November 30, 2009, to do so. On November 19, 2009, the court granted the motion to sever filed by Thomas. The State objected and noted its intent to seek supervisory writs, and the court granted the State until December 21, 2009, to do so, staying all proceedings while the State sought writs. The State failed to seek appellate court relief, and on January 4, 2010, the court set the matter for January 13, 2010, for the State to indicate which defendant it intended to try first. On January 13, 2010, the State elected to try Patín first, and the court ruled that all dates previously set were to remain in effect.
This court granted the writ application of Thomas and Patín, vacated the denial of their motions to quash by the district court, and remanded the case with instructions to allow the defendants to present evidence on the issue of prejudice from the delay in going to trial. State v. Patin, unpub. 2009-1620 (La.App. 4 Cir. 1/29/10); State v. Thomas, unpub. 2009-1647 (La.App. 4 Cir. 1/27/10).
| l7On remand, the court heard the matter on February 4, 2010. At the conclusion of the hearing, the court granted both motions to quash only on the issue of the violation of the constitutional right to speedy trial. The State noted its intent to *11 appeal, and the court stayed the release of the defendants to allow the State time to file its appeal. On February 10, 2010, the court denied the motion for release filed by Patin pending the appeal by the State. Both defendants sought writs, which this court granted, ordering their release. State v. Thomas, unpub. 2010-0205 (La. App. 4 Cir. 2/11/10); State v. Patin, unpub. 2010-0206 (La.App. 4 Cir. 2/11/10). However, on February 12, 2010, the Supreme Court revérsed the order of this Court and ordered a stay of their release until further orders from that Court. The Court then ordered the State to file its appeal “forthwith,” and this Court to give the appeal of the State expedited consideration. State v. Patin, 2010-0335 (La.2/24/10), 28 So.3d 261. Patin, however, did not seek review of the denial of his motion to quash by the district court on statutory grounds.
The appeal by the State as to Thomas and Patin appeal 2010-KA-0528, and Pa-tin’s appeal, 2010-KA-0529, were lodged in this court on April 13, 2010. This court denied the motion by the State to consolidate the cases on April 21, 2010, and the Supreme Court denied the writ by the State from this ruling. State v. Thomas, 2010-0943 (La.4/26/10), 34 So.3d 279. The State filed its brief in the appeal as to Patin on April 28, 2010. On May 21, 2010, the State appeal as to Patin was consolidated with the appeal and consolidated writ application involving Thomas, and both were set for an en banc hearing on June 2, 2010.
Likewise, as to Patin, because the constitutional speedy trial claim is based on the length of time he has been incarcerated for the present offense, the 118following is a chronology of the Patin case. The various docket masters and minute entries provide:
Docket Entries as to Morris Patin
Magistrate # 396048
12/27/01 First appearance; bond set; rule to show cause set for 1/8/02;
1/8/02 Rule to show cause reset 1/11/02;
1/11/02 Preliminary hearing set for 1/18/02;
1/18/02 Preliminary hearing reset to 1/25/02;
1/25/02 Patin represented by J.C. Lawrence; probable cause found; rule to show cause set for 2/27/02;
2/27/02 Rule to show cause reset to 3/1/02.

#428-349

2/28/02 Patin indicted for 14:30;
3/1/02 Case allotted to Section D;
3/6/02 Patin appeared and pled not guilty; hearing to determine counsel for both set for 3/27/02;
3/27/02 Reset for a status hearing on 4/12/02;
4/4/02 Status hearing reset to 4/10/02;
4/10/02 Motion hearing set 5/10/02;
5/10/02 Patin appeared with counsel Sonny Armond; reset motions to 6/13/02;
6/13/02 Reset motions to 6/14/02;
6/14/02 More motions heard, to be completed on 7/10/02; trial 8/13/02;
7/10/02 Counsel present and motions heard; witnesses called; court denied motion to suppress; trial set 8/13/02;
7/15/02 Trial reset to 9/24/02, no indication on whose motion;
9/17/02 Trial reset to 11/12/02 on State’s motion;
_⅛9/24/02 Trial reset to 10/21/02 on State’s motion;
10/21/02 Matter set in error; trial reset to 10/23/02;
10/23/02 Patin not brought up from jail; status set 10/28/02;
10/28/02 Counsel present without Patin; status reset to 10/31/02;
10/31/02 Charges nolle prosequied; case closed.

#434-092

10/17/02 Patin indicted for 14:30;
10/18/02 Case allotted to Section G; arraignment set for 10/22/02;
10/24/02 Patin, accompanied by counsel, pled not guilty (Armond for Patin); motions to be filed by 10/29/02; status set 10/31/02;
10/30/02 Patin filed motion to quash (based on allegation of deficient indictment) and motion to adopt for all defendants any motion filed by any defendant;
10/31/02 Court ordered State’s response by 11/18/02, rebuttal due 11/15/02; hearing set 11/15/02;
11/7/02 Patin filed memorandum of law;
11/18/02 State filed response to motion to quash; counsel for Patin argued; status set 11/27/02;
11/27/02 Court closed; reset 1/9/03;
*12 1/9/03 Ruling reset to 1/27/03;
1/27/03 Motion to quash denied; motion hearing set for 2/27/03, trial 3/13/03;
2/24/03 Hearing reset on State’s motion to 3/7/03 for outstanding discovery as to all defendants;
3/7/03 State filed motion for discovery and its answers; all dates to remain in effect;
3/13/03 scheduling conference set for 3/25/03;
_⅛3/25/03 Attorneys for all defendants present; court reset discovery conference to 4/10/03; motions for 4/15/03; pretrial hearing for 5/9/03; and trial for 5/19/03;
4/10/03 Patín not brought up from jail; reset to 4/15/03;
4/15/03 Patín present; reset motion hearing to 5/6/03;
5/6/03 Reset motion hearing to 5/12/03;
5/12/03 State advised all motions have been satisfied; court denied motion to sever as premature; final discovery conference (possibly for McCormick) set 5/19/03;
5/15/03 Patín filed various motions for subpoenas duces tecum, returnable 5/29/03;
5/19/03 Trial set for 8/25/03;
7/22/03 Patín filed motion to quash (based on composition of grand jury claim); hearing set 7/31/03;
7/31/03 Counsel for Patín not present; reset on defense motion without date; all other dates to remain in effect;
8/20/03 Patín filed motion to continue trial of 8/25/03; granted, reset to 10/20/03;
10/20/03 Patín status set 10/21/03;
10/21/03 Status reset to 11/4/03;
11/4/03 State to proceed with trial; final pretrial set 1/30/04, trial 2/9/04;
1/30/04 Joint continuance of trial by State and Patín (and Thomas) to 4/26/04;
4/20/04 Patín moved for continuance of trial; granted, reset to 6/28/04;
4/26/04 Trial reset to 6/28/04 as per continu-anee by Patín;
6/17/04 Patín moved for continuance of trial; motion hearing as to Patín set 8/2/04;
08/02/04 State granted continuance; pretrial 10/18/04 & trial 10/25/04 as to Patín (and Thomas);
10/18/04 State moved to continue; status set 10/21/04;
\9A 10/19/04 Counsel for Patín appeared, made no objection to State’s continuance; reset trial to 1/24/05;
1/21/05 Matter reset on motion of Patín (and Thomas) and State; trial 3/28/05;
3/11/05 Trial reset to 6/20/05;
3/28/05 Patín moved to continue trial; 701 release as to Patín denied; reset status 3/29/05;
3/29/05 All counsel present; trial reset to 6/20/05;
6/20/05 Trial reset to 9/12/05;
6/13/06 ADA set status hearing 6/30/06;
6/30/06 Defendants not present; status set 7/27/06 for Patín and for determination of counsel for Patín;
7/27/06 Counsel for Patín (Armond) withdrew; determination of counsel for Patín and status set 8/14/06;
8/14/06 Determination of counsel for Patín set 9/20/06;
8/15/06 New counsel for Patín (Edwin Hawkins) signed record; scheduling conference for all defendants set 8/24/06;
9/5/06 Trial set 11/13/06 for Patín (John Fuller enrolled as co-counsel);
11/13/06 Patín and State ready for'trial; status set 11/17/06;
11/17/06 Patín status hearing reset 12/11/06;
11/27/06 Court closed due to bomb threat; reset 12/11/06;
12/11/06 Pretrial conference set for 1/17/07;
1/17/07 Patín (and Thomas) not brought to court; reset 2/5/07;
2/5/07 Trial set for 6/25/07;
6/25/07 Trial continued to 11/5/07;
11/5/07 Counsel for Patín (Hawkins) withdrew; trial continued on joint motion of Patín and State; determination of counsel for Patín set 1/7/08;
1/7/08 New counsel (Dennis Moore) accepted appointment for Patín, but must wait to see if appointment needs to be submitted to the conflict panel; reset to 1/11/08;
^1/11/08 Status reset to 1/17/08;
1/17/08 Patin’s attorney (OPD) requested one week extension for determination of counsel; reset to 1/25/08;
1/25/08 Counsel still uncertain as to Patín; reset to 1/28/08;
1/28/08 Different counsel (David Price of the Baton Rouge Capital Conflict Office) will represent Patín; status set 2/12/08;
2/12/08 Patin’s counsel had a scheduling conflict and could not appear for hearing; Continued on defense motion to 2/19/08;
2/19/08 Counsel for Patín (Price) appointed and enrolled; status for Patín set for 3/3/08;
3/3/08 Counsel appeared; discovery hearing set for 4/17/08; status set 5/2/08; motion hearing set 6/9/08;
4/17/08 Discovery heard; status set as to both 5/2/08;
5/2/08 Patín filed several pretrial motions; motion heai’ing 6/9/08 as to both;
6/9/08 Another trial in progress; reset for motions for Patín (and Thomas) to 7/22/08;
7/22/08 State filed answers to Patin’s motions; hearing on motions reset on State motion to 8/19/08;
*13 8/19/08 Court ruled on various motions filed by Patin, but another motion hearing set for 9/30/08; Patin to seek writs, granted seven days to do so;
8/26/08 Patin granted to 8/29/08 to seek writs;
8/29/08 Court closed due to Hurricane Gustav; prior dates to remain;
9/30/08 Another trial in progress; reset motion hearing to 11/30/08;
10/24/08 Court received this court’s judgment of denial in 2008-K-1138 (writ taken by Patin on State’s intention to introduce victim impact testimony at penalty phase of trial);
11/3/08 Court rendered more judgments on Patin’s outstanding motions; trial set for 4/20/09;
2/5/09 Patin’s writ denied by Supreme Court 2008-KH-2766;
_⅛3/10/09 Patin filed notice of receipt of evidence; notation that motions still outstanding;
3/26/09 Patin filed more pretrial motions, placed items under seal, requested hearing on each motion; hearing set 4/1/09;
4/1/09 Patin moved for ruling on outstanding motions; hearing set 4/16/09; State granted continuance of 4/20/09 trial; status set 4/20/09;
4/16/09 Patin appeared for discovery hearing; brief hearing held; status 4/20/09;
4/20/09 State amended indictment to 14:30.1 as to Patin (and Thomas); status set 5/18/09 and trial 7/27/09 as to both;
5/18/09 Another trial in progress; status not held; keep all dates;
7/24/09 Status set for 7/27/09. Motion to sever filed;
7/27/09 Another trial in progress; motion to sever reset to 7/31/09, trial set 9/14/09;
7/31/09 Status hearing set 8/7/09;
8/7/09 Motion hearing set 8/13/09;
8/13/09 Motion hearing set 9/3/09, trial 10/12/09 as to Patin (and Thomas);
8/20/09 Trial reset to 10/13/09 as 10/12/09 is Columbus Day and court would be closed;
8/31/09 Patin filed motion to quash based on statutory and constitutional speedy trial grounds;
9/1/09 Ruling on Patin’s motion to quash set 9/3/09;
9/3/09 State moved to continue hearing on Patin’s motion to quash;
9/10/09 Hearing held; matter reset for evidentiary healing 9/24/09;
9/24/09 Another trial in progress; matter continued over Patin’s (and Thomas) objection to 10/15/09;
10/13/09 Trial date moot; keep evidentiary hearing of 10/15/09;
10/15/09 Court was closed; reset evidentiary hearing to 10/28/09;
_⅛10/28/09 Court denied motions to quash and denied evidentiary hearing; Patin (and Thomas) objected, granted to 11/30/09 to file writs;
11/19/09 Patin’s motion to sever deemed moot; State to take writs by 12/21/09; case stayed pending State’s writ; status set 12/21/09;
1/4/10 Patin (and Thomas) appeared; State did not take writ; reset to 1/13/10 for determination of which defendant State will try first;
1/13/10 State indicated it will try Patin first; all dates to remain in effect;
1/29/10 This court reversed court’s ruling on motion to quash and remanded case for evidentiary hearing;
2/4/10 Court held the hearing and granted the motion to quash on constitutional speedy trial grounds.
By its sole assignment of error, the State argues that the district court erred by granting the motion to quash the indictment as to Patin on constitutional speedy trial grounds. Although the district court denied his motion to quash on statutory speedy trial grounds, Patin did not seek review of this ruling. Thus, the only issue before this Court in the appeal as to Patin is the ruling of the court granting the motion to quash on constitutional grounds.[9]
ASSIGNMENTS OF ERROR
The State of Louisiana (as to Eugene Thomas) — The State argues that the district court abused its discretion in holding that Eugene Thomas could go free without having been tried.
The State of Louisiana (as to Morris Patin) — The State argues that the district court abused its discretion in granting the motion to quash filed by Patin, on constitutional grounds.
*14 19JEugene Thomas — Argues in his writ application that the district court erred in its failure to bring him to trial in excess of eight (8) years, thereby constituting a violation of the statutory time limitations for the commencement of trial, when the State has not met its heavy burden to prove the time limits were interrupted or suspended.

DISCUSSION

Sixth Amendment Speedy Trial Challenge
The standard for analyzing a claim by a defendant that his constitutional right to a speedy trial[10] has been violated is the four factor test enunciated in Barker v. Wingo, 407 U.S. 514, 530, 531-32, 92 S.Ct. 2182, 2192-93, 33 L.Ed.2d 101 (1972), which is as follows: (1) the length of the delay, (2) the reason for the delay, (3) the defendant’s assertion of his right to a speedy trial, and (4) the prejudice to the defendant.[11] State v. Batiste, 05-1571, p. 7 (La.10/17/06), 939 So.2d 1245, 1250. The circumstances of each individual case will determine the weight to be ascribed to the length of and the reason for the delay. Id.
In Barker, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), a habeas corpus proceeding was brought by a state prisoner. The United States District Court for the Western District of Kentucky denied his petition and the prisoner appealed. The United States Court of Appeals for the Sixth Circuit, 442 F.2d 1141, affirmed and the prisoner brought a writ of certiorari. The Supreme Court, Mr. Justice Powell writing for the Court, held that where a defendant was not seriously | ^prejudiced by more than a five-year delay between arrest and trial, and the defendant did not want a speedy trial, then the Sixth Amendment right to speedy trial of that defendant was not violated even though more than four years of the period was attributable to the failure or the inability of the prosecution to try a coindictee in order to have that coindictee provide testimony at the trial of this defendant. The Court affirmed the ruling of the lower courts.
In his opinion, Justice Powell wrote:
A second difference between the right to speedy trial and the accused’s other constitutional rights is that deprivation of the right may work to the accused’s advantage. Delay is not an uncommon defense tactic. As the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade. It the witnesses support the prosecution, its case will be weakened, sometimes seriously so. And it is the prosecution which carries the burden of proof. Thus, unlike the right to counsel or the right to be free from compelled self-incrimination, deprivation of the right to speedy trial does not per se prejudice the accused’s ability to defend himself.
In Barker, the Supreme Court also discussed the four-prong balancing test to determine whether speedy trial right of a defendant has been violated:
*15 A balancing test necessarily compels courts to approach speedy trial cases on an ad hoc basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant’s assertion of his right, and prejudice to the defendant.[12]
[[Image here]]
The length of the delay is to some extent a triggering mechanism. Until there is some delay which is 127presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. Nevertheless, because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar*581 circumstances of the case. To take but one example, the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge.[13]
[[Image here]]
Closely related to length of delay is the reason the government assigns to justify the delay. Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government.[14] A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.[15]
[[Image here]]
We have already discussed the third factor, the defendant’s responsibility to assert his right. Whether and how a defendant asserts his right is closely related to the other factors we have mentioned. The strength of his efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences. The more serious the deprivation, the more likely a defendant is to complain. The defendant’s assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right. We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.
A fourth factor is prejudice to the defendant. Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was |2Sdesigned to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious *16 is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown.
We have discussed previously the societal disadvantages of lengthy pretrial incarceration, but obviously the disadvantages for the accused who cannot obtain his release are even more serious. The time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness. Most jails offer little or no recreational or rehabilitative programs.[16] The time spent in jail is simply dead time. Moreover, if a defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense.[17] Imposing those consequences on anyone who has not yet been convicted is serious. It is especially unfortunate to impose them on those persons who are ultimately found to be innocent. Finally, even if an accused is not incarcerated prior to trial, he is still disadvantaged by restraints on his liberty and by living under a cloud of anxiety, suspicion, and often hostility.
We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process.[18] But, because we are dealing with a fundamental right of the accused, this process must be carried out with full recognition that the accused’s interest in a speedy trial is specifically affirmed in the Constitution.
Id., 407 U.S. at 530-533, 92 S.Ct. 2182. As applied to the instant case, it appears that the delay in the instant case exceeded seven years.
In Doggett v. U.S., 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992), a defendant was convicted of conspiracy to import cocaine by the United States District Court for the Middle District of Florida, and he appealed. The Court of Appeals affirmed, 906 F.2d 573. The Supreme Court granted certiorari and held that the delay of eight-and-one-half years between the indictment and arrest of the defendant violated his Sixth Amendment right to a speedy trial. The Court gave a lengthy discussion of the four Barker factors, and wrote (as to the first Barker Factor):
The Sixth Amendment guarantees that, “[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy ... trial.... ” On its face, the Speedy Trial Clause is written with such breadth that, taken literally, it would forbid the government to delay the trial of an “accused” for any reason at all. Our cases, however, have qualified the literal sweep of the provision by specifically recognizing the relevance of four separate enquiries: whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant *17 asserted his right to a speedy trial, and whether he suffered prejudice as the delay’s result. See Barker, supra, 407 U.S., at 530, 92 S.Ct., at 2192.
The first of these is actually a double enquiry. Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from “presumptively prejudicial” delay, 407 U.S., at 530-531, 92 S.Ct., at 2192, since, by definition, he cannot complain that the government has denied him a “speedy” trial if it has, in fact, prosecuted his case with customary promptness. If the accused makes this showing, the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim. See id., at 533-534, 92 S.Ct., at 2193-2194. This latter enquiry is significant to the speedy trial analysis | Snbecause, as we discuss below, the presumption that pretrial delay has prejudiced the accused intensifies over time. In this case, the extraordinary 8 1/2 year lag between Doggett’s indictment and arrest clearly suffices to trigger the speedy trial enquiry; its further significance within that enquiry will be dealt with later.
Doggett, 505 U.S. at 651-652, 112 S.Ct. 2686. As to the second Barker factor:
We have observed in prior cases that unreasonable delay between formal accusation and trial threatens to produce more than one sort of harm, including “oppressive pretrial incarceration,” “anxiety and concern of the accused,” and “the possibility that the [accused’s] defense will be impaired” by dimming memories and loss of exculpatory evidence. Barker, 407 U.S., at 532, 92 S.Ct., at 2193; see also Smith v. Hooey, 393 U.S. 374, 377-379, 89 S.Ct. 575, 576-578, 21 L.Ed.2d 607 (1969); United States v. Ewell, 383 U.S. 116, 120, 86 S.Ct. 773, 776, 15 L.Ed.2d 627 (1966). Of these forms of prejudice, “the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.” 407 U.S., at 532, 92 S.Ct., at 2193.
Doggett, 505 U.S. at 654, 112 S.Ct. 2686.[19] As to the fourth Barker factor, the Court opined:
Our speedy trial standards recognize that pretrial delay is often both inevitable and wholly justifiable. The government may need time to collect witnesses against the accused, oppose his pretrial motions, or, if he goes into hiding, track him down. We attach great weight to such considerations when balancing them against the costs of going forward with a trial whose probative accuracy the passage of time has begun by degrees to throw into question.[20]
Id., 505 U.S. at 656, 112 S.Ct. 2686.
* * *
Between diligent prosecution and bad-faith delay, official negligence in bringing an accused to trial occupies the middle ground. While not compelling relief in every case where bad-faith delay would make relief virtually automatic, neither is negligence automatically | S| tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him. It was on this point that the Court of Appeals erred, and on *18 the facts before us, it was reversible error.
Id., 505 U.S. at 656-657, 112 S.Ct. 2686.
Barker made it clear that “different weights [are to be] assigned to different reasons” for delay. Ibid. Although negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused’s defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun. And such is the nature of the prejudice presumed that the weight we assign to official negligence compounds over time as the presumption of eviden-tiary prejudice grows. Thus, our toleration of such negligence varies inversely with its protractedness,[21] and its consequent threat to the fairness of the accused’s trial. Condoning prolonged and unjustifiable delays in prosecution would both penalize many defendants for the state’s fault and simply encourage the government to gamble with the interests of criminal suspects assigned a low pros-ecutorial priority. The Government, indeed, can hardly complain too loudly, for persistent neglect in concluding a criminal prosecution indicates an uncommonly feeble interest in bringing an accused to justice; the more weight the Government attaches to securing a conviction, the harder it will try to get it.
To be sure, to warrant granting relief, negligence unaccompanied by particularized trial prejudice must have lasted longer than negligence demonstrably causing such prejudice. But even so, the Government’s egregious persistence in failing to prosecute Doggett is clearly sufficient. The lag between Doggett’s indictment and arrest was 8 1/2 years, and he would have faced trial 6 years earlier than he did but for the Government’s inexcusable oversights. The portion of the delay attributable to the Government’s negligence far exceeds the threshold needed to state a speedy trial claim; indeed, we have called shorter delays “extraordinary.” See Barker, supra, 407 U.S., at 533, 92 S.Ct., at 2193. When the Government’s negligence thus causes delay six times as long as that generally sufficient to trigger judicial | ^review,[22] and when the presumption of prejudice, albeit unspecified, is neither extenuated, as by the defendant’s acquiescence, e.g., 407 U.S., at 534-536, 92 S.Ct., at 2194-2195, nor persuasively rebutted, the defendant is entitled to relief.[23]
Id., 505 U.S. at 657-658, 112 S.Ct. 2686.
In Vermont v. Brillon, — U.S. -, 129 S.Ct. 1283, 173 L.Ed.2d 231 (2009), a defendant was arrested on felony domestic assault and habitual offender charges in 2001. Nearly three years later, in June 2004, he was tried by jury, found guilty as charged, and sentenced to imprisonment from 12 to 20 years. During the time between his arrest and his trial, at least six different attorneys were appointed to represent him. Brillon “fired” his first attorney, who served from July 2001 to February 2002. His third lawyer, who served from March 2002 until June 2002, was allowed to withdraw when he reported that Brillon had threatened his life. His fourth lawyer served from June 2002 until November 2002, when the trial court released him from the case. His fifth lawyer, assigned two months later, withdrew in April 2003. Four months thereafter, his sixth lawyer was assigned, and she took the case to trial in June 2004.
*19 The district court denied the motion to dismiss filed by Brillon for want of a speedy trial. The Vermont Supreme Court, however, reversed, holding that his conviction must be vacated, and the charges against him dismissed because the State did not accord him the speedy trial required by the Sixth Amendment. Citing the balancing test the U.S. Supreme Court stated in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101, the Vermont Supreme Court concluded that all four factors described in Barker weighed against the State. Ruling for Brillon, the |asVermont court said that the three-year delay in bringing him to trial was “extreme.” In assessing the reasons for that delay, the court separately considered the period of representation by each lawyer. The court acknowledged that the first year, when Brillon was represented by his first and third lawyers, should not count against the State. But the court counted much of the remaining two years against the State. Delays in that period, the court determined, were caused, for the most part, by the failure or unwillingness of several of the assigned counsel, over an inordinate period of time, to move the case forward. As for the third and fourth Barker factors, the court found that Bril-lon repeatedly and adamantly demanded a trial and that his lengthy pretrial incarceration was prejudicial.
The U.S. Supreme Court granted certio-rari and held that the delays caused by the failure of several counsel assigned to the Brillon case were not attributable to the State, for speedy trial purposes, and that it was his own disruptive behavior which was to be taken into account in the overall balancing test. The Court wrote, in pertinent part:
We hold that the Vermont Supreme Court erred in ranking assigned counsel essentially as state actors in the criminal justice system. Assigned counsel, just as retained counsel, act on behalf of their clients, and delays sought by counsel are ordinarily attributable to the defendants they represent. For a total of some six months of the time that elapsed between Brillon’s arrest and his trial, Brillon lacked an attorney. The State may be charged with those months if the gaps resulted from the trial court’s failure to appoint replacement counsel with dispatch. Similarly, the State may bear responsibility if there is “a breakdown in the public defender system.” Id., at 1111. But, as the Vermont Supreme Court acknowledged, Id., at 1126, the record does not establish any such institutional breakdown.
Brillon, 129 S.Ct. at 1287.
[[Image here]]
In addition to making assigned counsel’s “failure ... to move [the] case forward” the touchstone of its speedy-trial inquiry, the Vermont Supreme Court further erred by treating the period of each counsel’s representation discretely. The factors identified in Barker “have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process.” 407 U.S., at 533, 92 S.Ct. 2182, 33 L.Ed.2d 101. Yet the Vermont Supreme Court failed appropriately to take into account Brillon’s role during the first year of delay in “the chain of events that started all this.” Tr. of Oral Arg. 46.
Brillon sought to dismiss Ammons on the eve of trial. His strident, aggressive behavior with regard to Altieri, whom he threatened, further impeded prompt trial and likely made it more difficult for the Defender General’s office to find replacement counsel. Even after the trial court’s warning regarding delay, Brillon sought dismissal of yet another attorney, Donaldson. Just as a State’s *20 “deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the [State],” Barker, 407 U.S., at 531, 92 S.Ct. 2182, 33 L.Ed.2d 101, so too should a defendant’s deliberate attempt to disrupt proceedings be weighted heavily against the defendant. Absent Brillon’s deliberate efforts to force the withdrawal of Am-mons and Altieri, no speedy-trial issue would have arisen. The effect of these earlier events should have been factored into the court’s analysis of subsequent delay.[24]
Id., 129 S.Ct. at 1292. Of note, the Court also held that:
[t]he general rule attributing to the defendant delay caused by assigned counsel is not absolute. Delay resulting from a systemic “breakdown in the public defender system,” 955 A.2d, at 1111, could be charged to the State. Cf. Polk County [v. Dodson], 454 U.S., at 324-325, 102 S.Ct. 445, 70 L.Ed.2d 509. But the Vermont Supreme Court made no determination, and nothing in the record suggests, that institutional problems caused any part of the delay in Brillon’s case.
Id., 129 S.Ct. at 1292-1293. (emphasis added)
[o5Statutory Motion To Quash for Speedy Trial
La.Code Cr. Proc. art. 578. entitled General rule, provides:
A. Except as otherwise provided in this Chapter, no trial shall be commenced nor any bail obligation be enforceable:
(1)In capital cases after three years from the date of institution of the prosecution;
(2) In other felony cases after two years from the date of institution of the prosecution; and
(3) In misdemeanor cases after one year from the date of institution of the prosecution.
B. The offense charged shall determine the applicable limitation.
La.Code Cr. Proc. art. 579. Interruption of time limitation, provides:
A. The period of limitation established by Article 578 shall be interrupted if:
(1) The defendant at any time, with the purpose to avoid detection, apprehension, or prosecution, flees from the state, is outside the state, or is absent from his usual place of abode within the state; or
(2) The defendant cannot be tried because of insanity or because his presence for trial cannot be obtained by legal process, or for any other cause beyond the control of the state; or
(3) The defendant fails to appear at any proceeding pursuant to actual notice, proof of which appears of record.
B. The periods of limitation established by Article 578 shall commence to run anew from the date the cause of interruption no longer exists.
La.Code Cr. Proc. art. 580. Suspension of time limitations, which provides:
When a defendant flies a motion to quash or other preliminary plea, the running of the periods of limitation established by Article 578 shall be suspended until the ruling of the court thereon; but in no case shall the state have less than one year after the ruling to commence the trial.
*21 In State v. Brazile, 2006-1611 (La.App. 4 Cir. 5/30/07), 960 So.2d 333, a defendant was charged by bill of information with possession of crack cocaine. Following several continuances by the court, the State, and via joint motion of State and defense, and after a hurricane further delayed the proceedings, the defendant filed a motion to quash. We held that the period of limitation for | ¡.^bringing a defendant to trial was interrupted when the State was prevented from trying the defendant while court was not in operation due to a hurricane. We reversed and remanded, noting that:
Preliminary pleas that suspend the running of the prescriptive period under article 580 include motions to suppress evidence, motions for preliminary hearing, motions for continuance filed by defendant, and joint motions for continuance. See, State v. Fish, 2005-1929 (La.4/17/06), 926 So.2d 493; State v. Woodard, 35,202 (La.App. 2 Cir. 10/31/01), 799 So.2d 701; State v. Parker, 1999-1446 (La.App. 4 Cir. 3/22/00), 757 So.2d 893; State v. Brent, 2000-0072 (La.App. 4 Cir. 11/29/00), 775 So.2d 565; State v. Fabacher, 362 So.2d 555 (La.1978); State v. Cranmer, 306 So.2d 698 (La.1975). Arguably, during various time periods of this case the running of prescription was suspended, extending the date for which trial must commence.
As the trial court pointed out at the hearing on the motion to quash, those time delays are often misconstrued given the fact that it is the State who has control of the rescheduling of the matter. As such, a continuance by the court due to a trial in progress will give the State a suspension until it resets the matter on the court’s docket. Under those circumstances, the State has the ability to manipulate the prescriptive period in which to bring the case to trial. Although the trial court discussed this in his reasons for granting the motion to quash, the issue is not an issue for this court but one that should be addressed by the Legislature. This court is bound by the statutes as presently written and thus must determine what, if any, suspension and/or prescription occurred, whether through continuances, motions or the effects of Hurricane Katrina.
Given the language in La.C.Cr.P. art. 579, we find it unnecessary to piece together periods of suspension as provided by article 580. Article 579 provides that the period of limitation set forth in article 578 shall be interrupted if “the defendant cannot be tried because of ... any ... cause beyond the control of the state.” Under La.C.Cr.P. art. 579(B) “periods of limitation established by Article 578 shall commence to run anew from the date the cause of interruption no longer exists.” As noted in State v. Rome, 93-1221, p. 4, 630 So.2d at 1287: “An interruption of prescription occurs when the state is |S7unable, through no fault of its own, to try a defendant within the period specified by statute.”
This Court acknowledges that the State was prevented from trying Mr. Brazile on September 19, 2005 and for some time thereafter while the court was not in operation due to Hurricane Katrina. An application of article 579 allows for the two-year limitation period imposed by article 578 to commence anew once the causes preventing the State from trying the defendant were removed and the court reconvened. This court need not determine exactly when this occurred as the motion to quash was granted after only a little more than one year had elapsed since Hurricane Katrina struck the Gulf Coast. At that point, the State still had at least a year in which to commence trial. Although the renewal of the en *22 tire two-year period could be construed as extremely prejudicial to the defendant, the constitutionality of article 579 was not raised in this matter and therefore is not currently before this court. As a court of review, we are restricted by the contents of the record. Thus, this Court must determine that the trial court erred in granting defendant’s motion to quash.
Id., 2006-1611 pp. 3-5 (La.App. 4 Cir. 5/30/07), 960 So.2d at 335-336.
As previously stated, in its only assignment of error as to both Thomas and Patín,[25] the State argues that the district court “committed an error of law by imputing the delays caused by the defendant to the State.” Relying on Vermont v. Brillon, — U.S.-, 129 S.Ct. 1283, 173 L.Ed.2d 231 (2009), to distinguish the action of the district court in the instant case, the State argues that the United States Supreme Court found that a defendant’s right to speedy trial was not violated by imputing defense delays to the State.[26] The State notes that the Supreme Court held:
The Vermont Supreme Court charged against Brillon the delays associated with those periods, but charged against the State periods in which assigned counsel failed “to move the case forward.” 183 Vt. 475, 955 A.2d 1108, 1121, 1122 (2008). We hold that the Vermont Supreme | ssCourt erred in ranking assigned counsel essentially as state actors in the criminal justice system.
Brillon, 129 S.Ct. at 1287. The State also notes that the U.S. Supreme Court further explained that any “delay caused by the defendant weighs against the defendant,” Id., at 1290, because:
... “the attorney is the [defendant’s] agent when acting, or failing to act, in furtherance of the litigation,” delay caused by the defendant’s counsel is also charged against the defendant. Coleman v. Thompson, 501 U.S. 722, 753, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The same principle applies whether counsel is privately retained or publicly assigned, for “[o]nce a lawyer has undertaken the representation of an accused, the duties and obligations are the same whether the lawyer is privately retained, appointed, or serving in a legal aid or defender pro am.” Polk County v. Dodson, 454 U.S. 312, 318, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (internal quotation marks omitted). “Except for the source of payment,” the relationship between a defendant and the public defender representing him is “identical to that existing between any other lawyer and client.” Ibid.
Id. at 1290-1291. In addition, the State further notes that the Supreme Court further stated:
The Vermont Supreme Court’s opinion is driven by the notion that delay caused by assigned counsel’s “inaction” or failure “to move [the] case forward” is chargeable to the State, not the defendant. Id., at 1111, 1122. In this case, that court concluded, “a significant portion of the delay in bringing defendant to trial must be attributed to the state, even though most of the delay was caused by the inability or unwillingness of assigned counsel to move the case forward.” Id., at 1121.
An assigned counsel’s failure “to move the case forward” does not warrant attribution of delay to the State. Contrary to the Vermont Supreme Court’s *23 analysis, assigned counsel generally are not state actors for purposes of a speedy-trial claim. While the Vermont Defender General’s office is indeed “part of the criminal justice system,” Id., the individual counsel here acted only on behalf of Brillon, not the State. See Polk County, 454 U.S., at 320-322, 102 S.Ct. 445 (rejecting the view that public |S9defenders act under color of state law because they are paid by the State).... A contrary conclusion could encourage appointed counsel to delay proceedings by seeking unreasonable continuances, hoping thereby to obtain a dismissal of the indictment on speedy-trial grounds. Trial courts might well respond by viewing continuance requests made by appointed counsel with skepticism, concerned that even an apparently genuine need for more time is in reality a delay tactic. Yet the same considerations would not attend a privately retained counsel’s requests for time extensions. We see no justification for treating defendants’ speedy-trial claims differently based on whether their counsel is privately retained or publicly assigned.
Id. at 1292-1293. Hence the State argues that because of Brillon, the district court erred in granting the motions to quash as to both Thomas and Patin.
In State v. Scott, 2006-1610, p. 5 (La.App. 4 Cir. 4/25/07), 958 So.2d 725, 729, this court discussed the standard for evaluating a constitutional speedy trial claim:
The standard for analyzing a defendant’s claim that his constitutional right to a speedy trial has been violated is the four factor test enunciated in Barker v. Wingo, 407 U.S. 514, 530, 531-32, 92 S.Ct. 2182, 2192-93, 33 L.Ed.2d 101 (1972), which is as follows: (1) the length of the delay, (2) the reason for the delay, (3) the defendant’s assertion of his right to a speedy trial, and (4) the prejudice to the defendant. State v. Batiste, 05-1571, p. 7 (La.10/17/06), 939 So.2d 1245, 1250. The circumstances of each individual case will determine the weight to be ascribed to the length of and the reason for the delay. “[T]he delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge.” Id. (quoting Barker, 407 U.S. at 531, 92 S.Ct. at 2192).
In addition, the first of the four Barker v. Wingo factors, the length of the delay, is the “triggering mechanism,” and if the length of the delay is not “presumptively prejudicial,” the court need not inquire into the other three Barker factors. See State v. Scott, 2004-1142 (La.App. 4 Cir. 7/27/05), 913 So.2d 843; State v. Santiago, 2003-0693 (La.App. 4 Cir. 7/23/03), 853 So.2d 671.
In his writ application, Thomas argues that the district court erred when the court denied his motion to quash the indictment for a speedy trial violation on statutory grounds. Thomas argues that the three-year time period the State had to commence his trial under La.C.Cr.P. art. 578, has long ago expired. He argues that neither interruptions nor suspensions, as contemplated under La.C.Cr.P. arts. 579 and 580 respectively, have interfered with his motion under article 578. He further argues that the three-year period has tolled three times: in the seven and a half years before the motion to quash was filed in the district court, prior to Hurricane Katrina, and after the hurricane. Thomas argues that the denial of his motion to quash on statutory grounds by the district court should be reversed, and his release ordered.
Thomas further argues that he has never been brought to trial, and maintains that the three-year prescriptive period for *24 prosecuting him under the indictment has now expired. La.C.Cr.P. art. 578(A) states “no trial shall be commenced nor any bail obligation be enforceable: (1) in capital cases after three years from the date of institution of the prosecution.” He notes further that La.C.Cr.P. art. 532. entitled General grounds for motion to quash, provides in pertinent part that “[a] motion to quash may be based on one or more of the following grounds ... (7) [t]he time limitation for the institution of prosecution or for the commencement of trial has expired.”
The time limitation to prosecute for a capital case is set forth in La.C.Cr.P. art. 578, entitled, “General rule,” and provides: “A. Except as otherwise provided in this Chapter, no trial shall be commenced nor any bail obligation be | ^enforceable ... (1) In capital cases after three years from the date of institution of the prosecution....” Thomas argues that the basic legal analysis under Article 578 is well-settled:
Once the accused shows that the State has failed to bring him to trial within the time periods specified by La.C.Cr.P. art. 578, the State bears a heavy burden of demonstrating that either an interruption or a suspension of the time limit tolled prescription.[27]
Thomas also argues that the oral motion by the State, in response to his motion to quash was insufficient and failed to meet the heavy burden required to counter a meritorious claim that a statutory time limitation has expired. He points out that he turned himself in on January 5, 2002, and that he has remained in jail since that date. He also maintains that since he was incarcerated, he has been available to be present at trial without any legal defect for over three thousand days. He argues that the lengthy delay in his case was properly challenged through the procedural mechanism of a motion to quash, and the delay is “apparently meritorious.”[28] He maintains that “[o]nce an apparently meritorious claim is lodged, the State bears the heavy burden to demonstrate that the prescriptive clock has not run through suspensions or interruptions.”[29]
Thomas also argues that the disinterest of the State “went even further” when it chose to disregard the invitation by this Court to submit a response to his original writ application. The invitation was extended by this Court in an order that states, in part: “... not later than December 30, 2009, the prosecution shall file any opposition to the writ application.” However, the State did not file any [^opposition to writ application filed by Thomas until he applied to the Louisiana Supreme Court in State v. Thomas, No.2010-0586.
Thomas further argues that prior to that filing, the State had only directly addressed the issue of his statutory claim at a motions hearing on September 10, 2009. At that hearing, Thomas contends the State made numerous errors in its calculation of time, and that the district court again heard the State indirectly recount its version of the procedural history of this case when it held an evidentiary hearing on February 4, 2010. He emphasizes that the State, in both instances, made a grave error when it combined the delays relevant to Patín, with the delays arguably attributable to Thomas.
*25 Thomas farther declares that the district court committed errors in law when it considered his statutory claim, instead of requiring the State to supply a written, coherent, response to his motion to quash. He argues that the district court gave the State the “benefit of the doubt” when the court allowed the State to “prove” a suspension or interruption of time delays by merely reading the docket master into the record.[30] He also points out that the district court repeatedly said that all of the delays or continuances were because of the defense, and that the district court also made errors of fact in this case.
Thomas also argues that even if the State had properly argued before this Court the relevant suspension of time limitations in his case, as provided in art. 580, this Court would still find that the three year limitation for prosecution has expired. Thomas argues that he has a right to have his motion to quash the indictment granted, and that he is released immediately.
|4ijThomas also argues that the three-year statutory limitation to bring him to trial Post-Katrina has expired, and that his indictment should be quashed. He argues that on August 29, 2005, Hurricane Katrina hit the city of New Orleans, and that jury trials in the city did not commence until June 5, 2006. He argues that La.C.Gr.P. art. 579, provides three reasons for interruption of the time limit on prosecution. Thomas argues that this Court, in State v. Brazile, held that an interruption occurs anytime anything happens outside the control of the State when what occurred would prevent the State from bringing the defendant to trial. Brazile, 2006-1611, p. 4, 960 So.2d at 335.
Thomas argues that his counsel challenged this finding of this Court in Brazile. He maintains that even if this Court calculates the time as mandated in Brazile, that he is entitled to relief as the time limitations laid out in La.C.Cr.P. art. 578 have expired.
In further reference to Brazile, Thomas argues that according to Brazile, Hurricane Katrina interrupted all then pending cases in Orleans Parish. Id., 960 So.2d at 336. Therefore, the prescriptive clock began to run anew on June 5, 2006, the first day jury trials were conducted in the parish. The State, therefore, had until June 5, 2009 to bring him to trial, and it has not done so.
Thomas argues that there have been eight trial settings following Katrina: November 13, 2006, June 25, 2007, November 5, 2007, April 20, 2009, July 27, 2009, October 12, 2009, October 13, 2009, and February 1, 2010. On November 13, 2006, Clyde Merritt appeared on behalf of Thomas and informed the court that his office, the Orleans Public Defenders, ordered him to withdraw from the case. |44The withdrawal of Mr. Merritt suspended the period of limitation.[31] The length of suspension, however, ceased when new counsel was made known to the court.[32] On November 17, 2006, four days later, the court was notified that Lewis Unglesby would represent Thomas. Mr. Unglesby officially signed the record, twenty-eight days after Mr. Merritt withdrew, on December 11, 2006. The State, therefore, had an additional four days, or until June 9, 2009, to bring Mr. Thomas to trial. La.C.Cr.P. art. *26 580. Thomas argues that if this Court determines the December 11th date, rather than November 17th applies, the State had until July 3, 2009, to try Mr. Thomas.
Trial was set on February 5, 2007, and for June 25, 2007. The docket master for June 6, 2007, states that Lewis Unglesby moved for a continuance. No minute entry exists for this date, and a written motion to continue is not in the court file. The time limitations set out in La.C.Cr.P. art. 578 are suspended under La.C.Cr.P. art. 580, if the defendant files a motion to quash or “other preliminary plea.”[33] A motion for continuance filed by a defendant is a preliminary plea.[34] But, in order to suspend the time limitations under La. C.Cr.P. art. 580, a “preliminary plea” must be formally filed.[35] Thomas argues that because Mr. Unglesby failed to file a written motion, no suspensive delays may be attributed to him.
In addition, Thomas argues that La. C.Cr.P. art. 579, as applied to delays caused by Hurricane Katrina, is unconstitutional under the Sixth Amendment and Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101, (1972). He argues that the Louisiana Supreme Court has held that legislative enactments may not |4fiinfringe the Sixth Amendment right of an individual to a speedy trial by “granting prolonged and unnecessary delays ... for the commencement of trial.”[36] Thomas argues that under the Barker analysis for a consideration his right to speedy trial, the facts warrant that his motion to quash be granted.
Under the first factor for consideration — length of delay — Thomas argues that delays of at least a year are generally presumptively prejudicial and sufficient to trigger a full Barker inquiry.[37]
He argues that because this Court interpreted Hurricane Katrina as an interruption, the minimum potential delay for every case that was still pending at the point at which Hurricane Katrina struck surpasses the delay sufficient to trigger the full Barker inquiry. He argues that following the decision in Brazile, the State automatically had between one and three additional years to bring every pending case to trial. Following State v. Hamilton, 2007-0582, p. 7 (La.App. 4 Cir. 11/28/07), 973 So.2d 110, 114,[38] and the courts decision to set June 5, 2006, as the date when the prescriptive period restarted, the State additionally was permitted to tack on an extra nine months to its already unconscionably long grace period. This delay, he argues, is in clear violation of the Sixth *27 Amendment right to be free from “prolonged and unnecessary delays,”[39] and thus triggers the full Barker inquiry.
Under the second factor for consideration — reason for the delay — Thomas argues that this Court has held that Hurricane Katrina is a delay that “cannot be |^attributed to any party.”[40] While the delay caused by Katrina is not attributable to the defense or to the State, this Court must acknowledge that there is a substantial difference between the State being unable to prosecute a matter because of something the defendant has done to make himself unavailable, and the State being unable to prosecute a defendant because a natural disaster makes a courthouse temporarily unavailable.
Under the third factor for consideration — assertion of speedy trial right— Thomas maintains that he requested a trial on two occasions during his case.[41]
Under the fourth factor for consideration — prejudice—Thomas argues that while this Court in State v. Brazile, and in subsequent cases, held that the prescriptive period was interrupted and thus restarted due to Katrina, the decisions still explicitly cast doubt on the constitutionality of La.C.Cr.P. art. 579(B), particularly because of its potential to prejudice the defendant. In Brazile, for example, Thomas argues that this Court stated, “[ajlthough the renewal of the entire two-year period could be construed as extremely prejudicial to the defendant, the constitutionality of article 579 was not raised in this matter and therefore is not currently before this court.” Brazile, 960 So.2d at 336 (emphasis added). And that other recent Fourth Circuit decisions have echoed the concern in Brazile, and have used identical language to question the constitutionality of Article 579 as applied to Hurricane Katrina. State v. Hamilton, 2007-0582, p. 7 (La.App. 4 Cir. 11/28/07), 973 So.2d 110, 114; State v. Clay, 2007-0698, p. 4 (La.App. 4 Cir. 10/24/07), 970 So.2d 657, 660; and State v. Dright, 2007-0875, p. 4 (La.App. 4 Cir. 1/16/08), 976 So.2d 223, 225 (all of which stand for the | ^proposition that “renewal of the entire two-year period , could be found to be extremely prejudicial to the defendant.”).
Thus, because of these issues, Thomas urges this Court to address the concern voiced by this Court and to hold that La. C.Cr.P. art. 579 is unconstitutional as applied to delays caused by Hurricane Katrina. However, we find that the constitutionality of article 579 is not germane to the disposition of this instant case.
Finally, Thomas argues that the U.S. Supreme Court in Wardius v. Oregon, 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973), found an Oregon discovery statute to be unconstitutional under the Due Process Clause because it gave unfair advantage to the prosecution to the detriment of the defense. In Wardius, the Supreme Court held that “the Due Process Clause ... speak[s] to the balance of forces between the accused and his accuser.” Id. at 474, 93 S.Ct. 2208. The Court was in large part persuaded because the State did not “suggest any significant governmental interests which might support the lack of reciprocity.” Id. at 476, 93 S.Ct. 2208. Thus, Thomas argues permitting the State to increase the time they have to bring defendants like Thomas to trial by 33 months forcefully tilts the scale and unfair *28 ly benefits the prosecution to the detriment of the defense. Additionally, he argues the State cannot claim that there is “any significant governmental interest” in having an additional two and one-half years to try him.
The State argues that Thomas “has made a very weak showing of prejudice caused by the State or by the passage of time.” Particularly, the State argues that the claim of prejudice by Thomas is based on the unavailability of: (i) thej^girlfriend of Patín, Crystal Placide,[42] (ii) an alibi witness, Jai Williams, and (iii) the lack of memory of police officer Thomas Red-mann.
With respect to Crystal Placide, the State argues that while Thomas claims prejudice, he and Patín lost contact with Ms. Placide in 2004. The State points out that Thomas and Patín were prepared to proceed to trial without the testimony of Ms. Placide.[43] Therefore, the State contends, it is difficult to conceive how any prejudice with respect to the testimony of Ms. Placide has been caused by the passage of time. In addition, the State points out that Ms. Placide is the mother of the children of Patín,[44] and that because she has been contacted in connection with the case, she is aware that both Thomas and Patín are facing murder charges. Given the relationship between Ms. Placide and Patín, the State argues, that it is very reasonable to infer that Ms. Placide has made a conscious decision to not participate in the case for the defense. For these reasons, the State argues that the decision of Ms. Placide to refuse to cooperate cannot be attributed to the State or the passage of time.
As to Jai Williams, the State argues that Thomas lost contact with Ms. Williams as well. For the same reasons argued as to the readiness for trial in 2006 and 2007 by the defendants, without the testimony of Ms. Williams, the State contends that this argument of Thomas as to prejudice has no merit.
Concerning the two alibi witnesses, Brandon Mitchell and Angelo Brown, the State argues that Thomas and Patín did not allege the unavailability of these two alibi witnesses. The State argues that when Thomas announced his alibi |4fldefense in 2003, he disclosed to the State that the defense investigator, Jerry Reed, had interviewed the two aforementioned alibi witnesses. This disclosure was repeated by the State to the defendant when the State supplied Thomas with a bill of particulars. A subsequent defense investigator, Nicole Heiser, testified that she picked up where Jerry Reed left off, and this is how she learned of Ms. Jai Williams. The State argues that because of the court record, it is reasonable to infer that in the course of the investigation by the defense, Ms. Heiser also learned of the possible involvement of Brandon Mitchell and Angelo Brown in this case and that Ms. Heiser should have learned this, if not from the notes of Jerry Reed, then from the district court record.
The gist of the argument by the State is that the prejudice claimed by Thomas is *29 the alleged unavailability of witnesses who were previously unavailable when he announced readiness for trial. Thus, the ability of Thomas to present an alibi defense remains as intact as it was in 2006 and 2007, when he was prepared to proceed to trial.
The State further argues that the police officer, Thomas Eedmann, testified that he had only a marginal role in the investigation. He testified that he was one of many officers who participated in the investigation, and that he was a part of the class of persons defined as “whoever they could get a hold of on the day.” The lead detective and other officers, who had a more-than-marginal role in the investigation, remain available to testify. Hence, the State argues that the claim of prejudice by Thomas based on the lack of memory of Mr. Redmann is without merit.
| ^Additionally, the State argues that Thomas filed a motion for speedy trial in early 2005; but, that the motion was later withdrawn. For this reason, the State contends that Thomas has not suffered a loss of due process of law where due process is available and has not been utilized.
The State argues that in Barker; the Supreme Court noted the problem of “oppressive pretrial incarceration.” Id. at 532, 92 S.Ct. 2182. The State argues that while Thomas has been incarcerated, there exists a remedy which he has not availed himself. The law provides for a motion for reduction of bond (the State makes reference to La.C.Cr.P. art. 342).[45] However, in the instant case, the record indicates that Thomas has never moved for a reduction of bond. The State maintains that La.C.Cr.P. art. 701(D), provides for the release of a defendant without bond should the State fail to bring the defendant to trial within a certain period of time, and at no time did Thomas urge a bond reduction to the district court. In addition, the State argues that “[a]n article 701 release should ordinarily be employed before resorting to the more drastic remedy of quashing an indictment.” State v. Shannon, 09-0305, pp. 8-9 (La.App. 4 Cir. 9/09/09), 17 So.3d 1061, 1067. Thus, the State maintains that the constitutional right to a speedy trial is a matter of due process of law, and as such it has been incorporated to the states through the Fourteenth Amendment. The State argues that this is a tacase where due process of law has not been denied Thomas because it has been available all along. The State concludes that the failure of Thomas to avail himself of the remedies afforded by due process of law cannot result in his walking away from a murder without a trial.
Finally, the State argues that because of the extraordinary delays in this case, the district court committed legal error by imputing the delays of defense counsel to the State. Therefore, the State argues that *30 the district court committed reversible error and that the motion to quash granted in favor of Thomas be vacated.
In its argument against the release of Patin, the State argues that the district court “committed an error of law by imputing the delays caused by the defendant to the State.” The State applies the Barker v. Wingo factors in support of its argument that the district court erred.

Length of Delay

The State argues that looking at the first Barker factor, Patin has been incarcerated for over eight years, and charges of some sort have been pending almost that long. The State argues that given the seriousness of the offense, the length of delay in this case is presumptively prejudicial,[46] and this court must look to the other Barker factors to determine if his constitutional right to a speedy trial has been violated.

Reason for Delay

With respect to the second factor, the chronology set forth above shows that although some of the delay was due to continuances by the State, some of it was also caused by Hurricane Katrina and its aftermath as well as by Patin and his |S2codefendants. In his writ application, Patin asserted that he did not request a continuance of trial after March 28, 2005. However, his change of counsel twice after the storm, only the second of which was appointed (present counsel), and the resulting filing of several pretrial motions in the aftermath of the retention/appointment of new counsel delayed the trial date as well. Indeed, even as late as March 26, 2009, counsel for Patin was still filing pretrial motions, and on April 1, 2009, Patin moved for rulings on all outstanding motions. Patin appeared for a discovery hearing on April 16, 2009, and a status hearing was set for April 20, 2009. Therefore, even as late as April 16, 2009, the State could not take Patin to trial because motions were outstanding. Thus, although some of the delay was caused by the change of counsel and/or filings by other defendants, some by the State, and some by the aftermath of Hurricane Katrina, a big portion of the delay was also caused by pretrial filings on behalf of Patin, both by private counsel prior to the storm and by appointed counsel after the storm.

Assertion of Right to Speedy Trial

With respect to the third factor, the invocation of his right to a speedy trial, Patin filed a pro se motion for speedy trial, which this court transferred to the trial court in 2005. State v. Patin, unpub. 2005-0268 (La.App. 4 Cir. 3/11/05). Evidence on the Issue of Prejudice
As for the prejudice he suffered from the delay, at the September 10, 2009, hearing, counsel for Patin argued that Patin has been unable to find witnesses on his behalf because he has been incarcerated almost since the day of the crime. Counsel argued that Patin notified the State of potential witnesses in the first months after his incarceration. Counsel argues that statements made by defense witnesses have been lost over the years, and these witnesses have left the city. In | ¡^addition, counsel argues a surveillance tape (it is unclear if this was of the area where the murder occurred) has such outdated technology that it cannot be played at this point. Counsel notes that one of the officers who interviewed one of the surviving victims could not now remember the specifics of the case, even though he had been shown the police reports. Counsel identified this officer as Thomas Redmann, who *31 is no longer on the police force, and counsel indicated that this officer may have spoken with witnesses at the scene and with one of the surviving victims at the hospital. The State responded by arguing that the delays were caused by the actions of Patín, and that one of the victims was still alive and could be questioned.
In the district court, to move this matter along, both Patín and Thomas moved for an evidentiary hearing where they could present witnesses to bolster their claims of prejudice. The district court agreed and reset the matter, but by the time of the October 28, 2009, hearing, the court disallowed the hearing, citing this court’s opinion in State v. Shannon, 2009-0305 (La.App. 4 Cir. 9/9/09), 17 So.3d 1061[47], where this court reversed a ruling by the same trial court judge who had granted a motion to quash the charge. The district court noted that the granting of a motion to quash is an extreme remedy that is to be employed only in limited situations. The district court also noted that not all of the delay in the instant case was caused by the State, while in Shannon, even though the delays were caused by the State, this Court still reversed the district court. Thus, the district court denied Patín and Thomas an evidentiary hearing to establish prejudice.
On remand from this Court, the district court held the evidentiary hearing on 1¡^February 4, 2010. The defense first called Thomas Redmann, now employed by the Inspector General for the U.S. Department of Housing and Development. Det. Redmann testified that in December 2001, he was an N.O.P.D. detective assigned to the Seventh District of New Orleans. He testified that although he has very little memory of the event, he was dispatched to the scene of the shooting and then to Charity Hospital, where he met with Mr. Green, one of the victims. Det. Redmann testified that he had very little recollection of the case, and he had last read the police report, which he did not prepare, last summer when he met with an investigator. Det. Redmann testified that although he did not remember speaking with Mr. Green while at the hospital, or collecting some evidence while there, he did not doubt that it happened if it was so stated in the police report. He testified that he did not remember what Mr. Green told him about where the shooters were when they came on the scene. He testified that he vaguely remembered Thomas coming to the police station when Patín surrendered, but he did not remember speaking with Thomas or being present when he or Crystal Placide (Patin’s girlfriend) gave statements that day.
Det. Redmann testified that he could not say for sure if he actually responded to the scene of the shooting, mostly because that was not part of his assignment to the case. He testified that instead he must have been directed to go to the hospital to interview Mr. Green. He testified that he had no specific memory of collecting any evidence once there, nor did he remember if he turned any evidence over to Central Property and Evidence.
On cross-examination, Det. Redmann testified that several officers were involved in the investigation of the shooting. He testified that he believed that Det. |;;ñDarrel Rivet was the lead detective in the case. He testified that typically the entire detective squad would investigate a murder, as there was no homicide division at that time. Det. Redmann reiterated that he did not remember much about the case, and any knowledge he retained came from his reading of Det. Rivet’s report and the incident recall report. He testified *32 that even if he had collected any evidence, there would have been no need for him personally to have ordered any testing of any of this evidence or any photographs taken. He testified that it appeared that he was sent to Charity to get the status of the victim and gather any information that he could. He testified that if the police report indicated that he relayed any information that he received, he had not doubt that it occurred.
On redirect, Det. Redmann testified that he did not know what evidence he relayed after speaking with Mr. Green. He testified that he did not know if he also spoke with Mr. Steen, the other victim who survived the shooting. He testified that it was his understanding that Mr. Green survived the shooting, but later died from an unrelated matter; and, he guessed that one of the attorneys involved in the case told him about the death of Mr. Green.
Janet Hutson testified that she is an investigator for the BRCCO, and that she was assigned to the Patín case. She testified that she reviewed the police reports and statements given in the case, from which she created a potential witness list. She went to the scene of the murder, an apartment complex, and took photographs and measurements. She spoke with the apartment manager, who was also the manager at the time of the murder. Ms. Hutson testified that she verified that the residents of the complex had moved since the murder. She testified that she specifically tried to find anyone who had called 911 about the shooting. She was able to find only one person, who told her that she had called 911 only because |Mshe heard shots, but that witness did not know anything about the shooting. Ms. Hutson testified that she tried to find Crystal Placide, the girlfriend of Patín and the mother of his three children, and she located her in Houston, Texas. However, Ms. Hutson was unable to find Ms. Placide when she went to Houston a few weeks prior to the hearing to talk to her. Ms. Hutson testified that she had been told that Ms. Plac-ide lived in the apartment complex and accompanied Thomas and Patín when Pa-tín surrendered to the police. Ms. Hutson testified that she learned that Ms. Placide was the victim of a burglary/robbery that occurred at her apartment a week before the shooting. Ms. Hutson testified that she had never worked on another case where she was unable to find any witnesses.
On cross-examination, Ms. Hutson testified that she is a paralegal, and that she has been investigating cases for nine years. She described the steps she generally took to find witnesses: she usually starts her investigation with computer searches of potential witnesses, then she goes to addresses gleaned from the computer to speak with the witnesses, their family members, and their neighbors. She testified that although she did not remember how long before the hearing she had been assigned to this case, she testified that it occurred when the BRCCO was appointed to represent Patín, which happened after the storm. She testified that she was not assigned to find Troy Steen, one of the victims.
Nicole Heiser testified that she is a private investigator who is employed by the Orleans Public Defender Office. In connection with her work for OPD, she interviews clients, locates and interviews witnesses, takes photographs, diagrams scenes, delivers subpoenas, and canvasses crimes scenes. She testified that she did all of these tasks after being assigned the Thomas case. She testified that Thomas gave a statement to the police, and according to this statement, he was at Lake [ fl7Forest Plaza mall on December 23, 2001. She testified that the mall did not reopen *33 after the storm. She testified that a witness named Jai Williams also stated that Thomas was at the mall several times that day, and Ms. Williams also stated that she saw Patin at the mall with a group of three or four others. Ms. Heiser testified that she learned of the proposed alibi evidence of Ms. Williams from Jerry Reed, a former investigator employed by the first private attorney of Patin on the case. Mr. Reed has since died. Ms. Heiser testified that she could not find the whereabouts of Ms. Williams at this time despite all of her efforts to find her. Ms. Heiser testified that she visited the address that Ms. Williams gave in a statement[48], but Ms. Williams no longer lived there. Ms. Heiser tried unsuccessfully to find her through an Internet search, and she tried to locate Ms. Williams through the records of the company where Ms. Williams worked at the time of the murder, but she could not find her.
Ms. Heiser testified that she spoke with former Det. Redmann and other detectives associated with the case. She testified that she believed from reading the police report that Det. Dan Christensen obtained information concerning the burglary at the apartment shared by Patin and Ms. Plac-ide, which was in the same building where the shooting occurred. According to the police report, the burglars shot at Patin and Ms. Placide when they returned home while the burglary was in progress. Ms. Heiser testified that when she contacted Det. Christensen, he told her that his only involvement in the case was working crowd control at the murder scene. She testified that when she met with Det. Christensen the second time to serve him a subpoena, he refused service, telling her that he did not think she was j ¡^authorized to serve the subpoena, and in any event he did not want to go to court because he had to tend his sick wife. She testified that she believed that Det. Christensen was no longer employed by the N.O.P.D.
Ms. Heiser testified that the 911 calls indicated that there might have been two other witnesses to the shooting. One caller thought that a maintenance man may have seen the shooting, while in another call a woman stated that she did not see the shooting, but a child can be heard in the background stating that he or she saw the shooting. Ms. Heiser was unable to find either of these potential witnesses.
On cross-examination, Ms. Heiser testified that she last found Ms. Placide in late 2007 or early 2008, but Ms. Placide would not come to the door to speak with her. She testified that she began working on the case in 2004, and she spoke with Ms. Placide before the storm, before current counsel for Patin had been appointed. She was also able to find the whereabouts of Mr. Steen, one of the victims, by using the address listed in the police report. She testified that she was unable to find Ms. Williams before the storm, even though the mall was still in operation at that time.
At the conclusion of her testimony, the court noted that Det. Christensen had appeared in court in connection with this ease many times, and counsel could have asked him if his role had been limited to crowd control.
The last witness for the defendants at the hearing was Kerry Deichmann, who testified that she was employed by BRCCO and was originally assigned to the case in 2008 for mitigation investigation, as the charge at that time was first degree murder. Ms. Deichmann testified that she also looked for but could not find Ms. Placide, even though Ms. Placide and Patin had three children together. She *34 1 ¡^testified that she was able to contact Ms. Placide’s brother, but he told her that he had not seen his sister for three months. Ms. Deichmann testified that when she tried to contact him again in early 2009, his phone number had been disconnected. She testified that she never spoke to him in person, and when she went to the address she had for him, she could not find him. She admitted that she was able to find Mr. Steen, whom she indicated was not related to either Patín or Thomas.
On the issue of prejudice, counsel for Patín at the hearing first noted the anxiety his client suffered in the over eight years of waiting for trial. Counsel argued that due to this delay, the defense lost contact with Ms. Placide, who was a witness to the burglary that occurred at her apartment six days before the shooting. Counsel argued that part of the defense strategy was to show that the three men who burglarized the apartment of Ms. Placide and Patín, and shot at them were the same three men who committed the murder in this case. Counsel stated that Ms. Placide would have described the men, whose description (three men dressed in black) was the same as the description given of the three men involved in the murder, which occurred in the same building as the Plac-ide apartment. Counsel testified that her office was appointed to represent Patín after contact was lost with Ms. Placide.
Counsel also argued that because of the delay, the defense lost track of Ms. Williams, the alibi witness who would have placed Patín and Thomas at the mall on the day of the shooting. Counsel argued that prior counsel’s investigator found Ms. Williams and interviewed her, but she now cannot be found, and the investigator who found her has died. Counsel noted that Thomas told the police when Patín surrendered that he and Patín were at the mall when the shooting 16(loccurred. Counsel argued that these defense witnesses could have been used to impeach the testimony of Steen, the sole surviving victim.
Counsel then pointed to the fact that former Det. Redmann could not remember anything about his part in the investigation of the case, specifically what Mr. Green told him when he interviewed Mr. Green at the hospital and what evidence he may have collected during the hospital visit. Counsel also pointed to the statement of Det. Christensen that he was only on the scene of the murder for crowd control, which counsel seemed to think was incorrect. Counsel also briefly mentioned that someone else actually matched the description given by Mr. Steen, but Patín was arrested because he lived at the nearby apartment. Counsel did not specify who this person was. Counsel referred to the ABA guidelines for defense attorneys and insisted that counsel at this point could not interview witnesses. Counsel distinguished Vermont v. BriLLon, where the Court held that the delay caused by change of counsel appointed by the State could not be attributed to the State because Brillon repeatedly fired his attorneys, while neither Patín nor Thomas fired any of their attorneys.
Counsel for Patín argued at some length about which party was responsible for each continuance of trial that was granted in this case, but she conceded that most of this argument was more relevant to the statutory speedy trial claim (which is not before this court as to Patín). When counsel noted that her office enrolled in the case in February 2008, the court stated that new counsel immediately asked for a continuance. When the court asked whether the defense ever announced after the storm that it was ready for trial, counsel gave two dates: November 13, 2006 and July 27, 2009. The ADA then noted that on the November 2006 date, Thomas *35 did not have counsel, and that on November 5, 2007, when Thomas announced he was | M ready for trial, Patín did not have counsel. Although not mentioned by any party, Thomas filed his motion to sever three days before the July 27, 2009 trial date.
Counsel for Thomas adopted most of the lengthy argument by counsel for Patín. She noted that each of the attorneys for Thomas built the defense on his alibi, and evidence to support this alibi is lost because neither Ms. Williams nor Ms. Placide can be found. Counsel argued that what happened in this case was a complete breakdown in the public defender system mentioned in Vermont v. Brillon, and thus the delays in this case must be attributed to the State, even if not to the Office of the District Attorney. Counsel reminded the court that it had ordered her ex-boss at OPD into court and threatened him with contempt if he did not assign counsel. The court agreed, noting that the arrival of Ms. Ward’s former boss “coincided with the breakdown of the system.” The court noted that counsel for McCormick was able to take him to trial. The court clarified that the argument of Thomas meant the sovereign state of Louisiana, not the Office of the District Attorney. The court then stated:
In that the sovereign decided to change the organizational structure of the Public Defenders Office, bring people in here who had absolutely no clue what goes on in this building, and charge those folks with running that program to the extent that they may have had something to do with the delays in the case, you and I agree, but would the Court of Appeals [sic] find the same thing? Will they find that the delay is attributable to the State to the extent that this Court should grant the ultimate relief, and that is granting the Motion to Quash?
The State responded that the defense was not able to show prejudice, noting that former Det. Redmann is available, and even though he does not remember much about the case, his role in the investigation was minor. The ADA stated that although Mr. Green is now deceased, what he told Det. Redmann at the hospital | fi2was the same as what Mr. Steen, who is still alive and available, told the lead investigator, who apparently is also available and remembers the case. The ADA also noted that the defense found Ms. Placide twice, but she did not want to testify.

Rulings of the District Court

After a recess, the district court noted that as per the Barker v. Wingo factors, this Court had already found the eight-year delay presumptively prejudicial. The district court noted that it had never seen a delay of this length, but two unusual factors created the delay: (1) Hurricane Katrina; and (2) the delay caused by the public defender’s office by its refusal to appoint counsel or the inability of those appointed counsel to prepare the case for trial. The court noted: “Speedy trial is intended to serve as a shield for the defendant’s protection, but not as a sword for his escape.” The district court noted that while some of the delay was caused by the initial wish by the State to try the third codefendant first, and some by Hurricane Katrina, the defense was responsible for the majority of the delay, which was not caused by any actions of the district attorney’s office. As for prejudice, the district court noted that it must determine whether the delays deprived the defendants of a fair trial and whether they would be able to defend themselves. The district court also noted the fact that the alibi witness is no longer available to testify. The district court then stated that having reviewed the record and considered the facts of the case, it would grant the motions to quash. *36 The district court acknowledged that the delay was not the fault of the district attorney’s office; rather, it was caused by actions and inaction of the public defender office. The district court stated:
What weighs heavily in this decision is the finding of this Court that when an indigent person is assigned a Public Defender and his right to a fair trial is prejudiced by a[n] |n3eight year delay because of the actions, or inactions of his attorneys, that the accused should not suffer because of the actions of the Public Defenders Office to the extent that the Public Defenders Office was and is, an agent or bureau of the State government, the State is partially responsible for this delay. But, I want it to be clearly noted in the record that when I say State, I am not referring to the District Attorney’s Office.
[[Image here]]
I find that the Defendants, through no fault of their own, cannot mount the Defense.
[[Image here]]
I find the prejudice to be deeper and more significant than just the inability of these private detectives to find that one alibi witness, and that is the ruling of the Court,
The district court stayed execution of the judgment to give the State time to appeal, and the district court refused to release the defendants, noting that it had released McCormick when the court granted his motion to quash, and McCormick was killed within a matter of days following his release.
In its appeal, the State contends that the district court erred in two respects: (1) the delays caused by the actions of the appointed attorneys cannot be imputed to the State; and (2) Patín failed to show that the prejudice caused by the delay was so great that it deprived him of his right to present a defense.

Cause of the Delay

With respect to the issue of delay, in the matter sub judice as to Patín, he was represented by private counsel, Mr. J.C. Lawrence, when the preliminary hearing was held in magistrate court, approximately a month after his arrest. The first indictment against Patín and Thomas was returned approximately a month after that, and three months after indictment Mr. Sonny Armond, another retained attorney, enrolled to represent Patín. Mr. Armond represented Patín until he | ^withdrew in July 2006, in the aftermath of the storm. Less than a month later, Mr. Edwin Hawkins, another retained attorney, enrolled, with Mr. John Fuller enrolling as co-counsel a few weeks after that. In November 2006, counsel for Patín indicated his readiness for trial, but at that time, counsel for Thomas (Mr. Merritt), who had represented Thomas since the inception of the first indictment, withdrew because the OPD did not retain him. However, approximately a month later, present counsel for Thomas was appointed to represent him. Mr. Hawkins withdrew from representation of Patín in November 2007, and present counsel, the BRCCO, was appointed in February 2008. Thus, Patín has been represented by state-appointed counsel only since February 19, 2008. Counsel then immediately filed a volume of motions and pleadings, some of which were still pending at the time Patín filed his motion to quash in August 2009.
The district court found nonetheless that the time delays in this case that occurred after the storm were attributable to the State, apparently finding that the disruptions in the indigent defender office after the storm caused a systematic breakdown *37 such as that envisioned by the Court in Britton, and thus the delay after the storm must be attributed to the State. This may have been present in other cases, but it does not appear to have been the reason for the long delay in this case. The last retained counsel for Patín withdrew in November 2007, and present counsel was appointed and enrolled in February 2008, three months later. Although it appears from the minute entries that there was some confusion as to whether another attorney from OPD could be appointed to represent Patín, or if a conflict-resolution attorney needed to be appointed, the delay in appointment was just over three months. Therefore, even if this delay can be considered to have |6fibeen due to a “breakdown” in the public defender system, it comprised only three months of the over-eight years of delay in this case.
Moreover, Patín cannot have been said to have suffered much of a delay when counsel for Thomas changed. Mr. Merritt represented Thomas from his appointment in May 2002 until after the reorganization of the OPD, and Mr. Merritt withdrew in November 2006. However, former counsel for Thomas (Mr. Unglesby) enrolled in December 2006 and represented Thomas part of that time with current counsel for Thomas (Ms. Ward). Therefore, any possible further delay that can be attributed to the State due to the reappointment of counsel for Thomas was at best an extra month. Since the appointment of counsel for Thomas, counsel has vigorously handled his case. In addition, even if Patín felt that the “delay” caused by the appointment of new counsel for Thomas prejudiced him, Patín did not file his motion to sever his trial from that of Thomas until July 31, 2009, less than a month before he filed his motion to quash.
Therefore, even if some of the delay in the change of counsel for Patín and Thomas can be attributed to the State, this delay comprised approximately four months of the over-eight years of delay. The trial court erred by finding that a breakdown of the public defender system caused the delays in the Patín case. The argument of the State on this issue has merit.

Prejudice

In addition to finding that a breakdown in the indigent defender system caused a substantial delay in this case, the district court found that the delays resulted in Patín being unable to present his defense. The State argues that the trial court erred in this ruling as well. As shown by the facts set forth above, Patín and Thomas alleged prejudice in that four particular witnesses cannot now be found or |mdo not remember much about their involvement in the case. The defense identified these four witnesses as Thomas Redmann, Dan Christiansen, Crystal Placide, and Jai Williams.
With respect to Det. Redmann, he testified that he could not remember much about his involvement in the investigation of the case. At the evidentiary hearing, both defense counsel questioned former Det. Redmann concerning whether he remembered what Mr. Green, one of the surviving victims, told him when he interviewed Mr. Green in the hospital. They also questioned him about whether he remembered collecting any evidence from Mr. Green at that time. Det. Redmann testified that he only vaguely remembered going to the hospital, and he did not remember what Mr. Green told him, if anything, or if he collected any evidence. Apparently the police reports spoke to both of these issues, and Det. Redmann stated that if the police reports indicated that Mr. Green told him something about where the shooters came from or that he collected any evidence, then it must have occurred.
*38 Defense counsel argued that the inability of Det. Redmann to remember these details hampers their ability to mount a defense. However, it is unclear how the inability of Det. Redmann to recall these particular facts prejudices Patín or Thomas. As noted above, the record contains neither the police reports nor any motion hearing transcripts. Thus, it is not clear how either of these factors fit into the circumstances of this case. It is also unknown whether Mr. Green gave a formal statement to the police. The appeal record contains a motion to continue the trial, filed by the State on October 18, 2004, which is based on the fact that Mr. Green was hospitalized at that time and could not attend trial, although he is now deceased. Nonetheless, it does not appear that the district court based its ruling on |fi7the inability of former Det. Redmann to remember specifically what he did in this case.
Likewise, it does not appear that the court based its ruling on the alleged lack of ability by the defense to get Det. Christensen into court. Counsel noted that Det. Christensen then refused to appear because his wife was ill. Counsel also stated that Det. Christensen told a defense investigator that his only involvement in the murder investigation was being on the scene for crowd control. Counsel insisted that Det. Christensen was involved in the investigation of the burglary/robbery/attempted shooting at the apartment of Ms. Placide, which occurred in the same building and a few days before the murder. Again, it is unclear whether the police reports show that the involvement of Det. Christensen in the murder investigation was greater than what he told the investigator it was. However, the court noted that Det. Christensen has been present in court several times after present counsel was appointed, and counsel could have questioned him at those times, but counsel admitted that she did not recognize him. Thus, there was no basis to grant the motion to quash filed by Patín as to prejudice resulting from the loss of favorable defense evidence either from Det. Red-mann or Det. Christensen.
The ruling of the district court appears to have been based on the inability of the defense to find Ms. Placide and Ms. Williams. With respect to Ms. Placide, she was the girlfriend of Patín at the time of the murder, and is the mother of his three sons. He lived with her at her apartment, which was in the same building where the murders occurred. The defense argues that six days before the murder, three gunmen burglarized their apartment and shot at Patín when he and Ms. Placide arrived home. At the hearing, the defense alleged that these men matched |fi8a description of the three men involved in the shooting; the description, however, was three men dressed in black, a vague description at best. Counsel for Thomas last knew where Ms. Placide was living in late 2007 or early 2008, prior to the appointment of counsel for Patín. However, during that time, Patín had private counsel, and any inability of present counsel to be able to find Ms. Placide prior to present counsel’s appointment cannot be attributed to the State; at most, the fault would lie with former, private counsel. In addition, even when counsel for Thomas discovered the whereabouts of Ms. Placide, she refused to even come to the door to speak with the investigator assigned to the Thomas case. Therefore, the inability to find Ms. Placide at this point cannot be attributed to any actions or non-actions by the State. The district court erred by granting the motion to quash on this basis.
With respect to Ms. Williams, the defense alleged that she would have testified that she saw both Patín and Thomas *39 at Lake Forest Plaza mall several times on the day of the shooting. At the hearing, the investigator for Thomas testified that she learned of Ms. Williams’ proposed testimony from an investigation by Jerry Reed, an investigator for Mr. Lawrence, first retained counsel for Patín. Mr. Reed has since died. Thomas also apparently told the police that on the day Patín surrendered to the police that he and Patín were at the mall when the shooting occurred. The present investigator testified that she unsuccessfully tried various avenues to find Ms. Williams. She testified that Ms. Williams no longer lived in the same place, and the mall did not reopen after Hurricane Katrina. Nonetheless, the investigator testified that she began working on the case in 2004, prior to the storm.
|fi9Again, because the specific facts of the case are not known, it is unclear whether the testimony of Ms. Williams that she saw the defendants at the mall several times on the day of the murder would exonerate them. The answer by the State to the bill of particulars noted that photographs of McCorry’s body were taken at 3:30 p.m., on the day of the shooting; thus, the shooting occurred some time before 3:30 p.m. It is unclear whether Ms. Williams gave a statement to the police or only to Mr. Reed. It is also unclear at what time Ms. Williams alleged that she saw the defendants. The scene of the murder, 6881 Park Brittany, is less than five minutes from the mall where Ms. Williams allegedly saw the defendants.[49] Thus, it is probable that the proposed testimony of Ms. Williams would not have provided an alibi for the defendants. Given the evidence adduced at the hearings on the motions to quash, the defense failed to show that Ms. Williams could have completely exonerated either of the defendants, given the fact that she saw them several times during the day of the murder at a location within a five-minute drive of the murder scene.
In its brief, the State also alleges that two other alibi witnesses placed the defendants at the mall on the day of the shooting, Brandon Mitchell and Angelo Brown. According to the answer to the bill of particulars provided by the State, these men told Mr. Reed that they were shopping at the mall with Thomas and Patín on the day of the murder. However, it is unclear if either of these witnesses is still available to testify, as neither was mentioned at any of the hearings on the motions to quash. However, as the defense has not alleged that they are unavailable, it appears that they are either still available to testify as alibi |7flwitnesses, or defense counsel has chosen not to call them for some reason.
Moreover, as with Ms. Placide, any failure of present counsel to find Ms. Williams cannot be attributed to the State. Private counsel for Patín was aware of the existence of Ms. Williams, at least since the time of his first retained counsel because the investigator for that attorney found her, and apparently took a statement from her. It is unclear when her whereabouts became unknown, but it apparently occurred before the storm, and at that time Patín still had private counsel. Thus, any delay in this case that caused the defense to lose the whereabouts of Ms. Williams is not attributable to the State, and the district court erred by granting the motion to quash on behalf of Patín on that basis.
Our review of the record indicates that although the district court discussed the long delays and the fact that Thomas filed motions for speedy trial in 2005, the dis *40 trict court still granted the motion to quash, for the following reasons:
In the 27 years that I have been affiliated with this Court, or have practiced criminal law in Federal Court, I have yet to come across a case with a delay as long as this case. However, there were two factors involved in this case that are unusual or peculiar to this case. One, is the lapse of time due to Hurricane Katrina, and the second, was the Public Defenders Office causing much of the delay by their refusal to appoint counsel to represent the defendant’s and/or the inability of the attorneys who were appointed, to prepare the case for trial.
[[Image here]]
After the McCormick trial [in October of 2003], this Court finds that the Defense was responsible for most of the delay; therefore, the responsibility for the delay rests in large part with the Defense, not the State.
[[Image here]]
That brings us to a very important question which may be an issue of first impression in Louisiana and that is, when a Defendant has been denied a speedy trial, |71 which in this case I find that they were, should the State be prohibited from the prosecution of the case when those delays were caused by the Defense attorneys? In other words, is the State, in its. sovereign capacity, responsible for these delays; not the district attorney, contrary to Mr. Phillips’ argument. This Court does not find and I have not been presented with any proof, whatsoever, that the District Attorneys office was responsible for these delays.
I find that there’s clear and convincing evidence that these delays were not caused by actions of the State. These delays were caused by the Public Defenders Office. What weighs heavily in this decision is the finding of this Court that when an indigent person is assigned a Public Defender and his right to a fair trial is prejudiced by a eight year delay because of the actions, or inactions of his attorneys, that the accused should not suffer because of the actions of the Public Defenders Office to the extent that the Public Defenders Office was and is, an agent or bureau of State government, the State is partially responsible for this delay. But, I want it to be clearly noted in the record that when I say State, I am not referring to the District Attorney’s Office....
I don’t want the Court of Appeals to make an inference that I think at all that the State is responsible for this, but in this case of first impression, I find that the Defendants, through no fault of their own, cannot mount the Defense. Whether I believe these private investigators or not, and I must be honest with you, some of the things they said I don’t believe, and plugging in names into a website, I think there’s other things you can do.
This Court finds that implicit in La.C.Cr.P. art. 538[50] is the requirement *41 that prosecution will occur in a timely manner. However, our review of the record in this matter indicates that the delay in the appointment of new counsel for Thomas, |72after his original counsel was dismissed by the indigent defender program after Hurricane Katrina, was only one month.
The delay in this case, caused by the appointment of counsel for Patin was only three months, contrary to the finding of the district court. These delays did not result from the breakdown in the indigent defender system that would have allowed the trial court to attribute these delays to the State under Vermont v. Brillon. Counsel was appointed for Patin in early 2008, and almost immediately after enrolling, counsel filed a multitude of motions in the case. As per Britton, any delays caused by the filings of appointed counsel cannot be attributed to the State.
Moreover, the four months of delay that can be attributed to the State did not cause the defense to lose contact with Ms. Placide or Ms. Williams, nor was it the cause former Det. Redmann’s loss of memory of his participation in the investigation of the murder, which in any event apparently was memorialized in the police reports. Therefore, the district court erred by granting Patin’s motion to quash.
Considering the Barker factors, we find that the delay in excess of eight (8) years to be prejudicial, but that the delay was not prejudicial enough to warrant that the indictment be quashed. Considering that Barker specifically requires a case by case analysis of the factors, we find that Hurricane Katrina was a factor in the excessive delay, but not as much as the continuances requested by both the defendants and the State. The material issue before this Court is whether the State was ready to bring McCormick to trial, but not Thomas and Patin. The State has not demonstrated a basis for trying McCormick first, given that Thomas and Patin were in custody and were indicted contemporaneously with McCormick.
ItoAs to the motion to adopt included in the minute entries, and what occurred on the next day following, this Court does not accept the State’s argument that the delay was assessed to all defendants. We find that the district court should have clarified to whom the motion was addressed.
Additionally we find that at the district court there was an institutional breakdown as follows:
The Orleans Public Defenders (ODP) restructuring, immediately following Hurricane Katrina contributed to these delays in that;
a. No capital attorneys were available in New Orleans to represent the defendants, but,
b. When new counsel enrolled, he filed new motions which commenced time running anew, motions which may have not been needed. The new counsel could have reviewed the record in its entirety and he/she may have announced readiness for trial sooner.
However, we cannot say that the State was responsible for the delay of this ease by taking McCormick to trial first. While the decision of the State to try McCormick first certainly initiated the snowballing effect for the lengthy delay, and the delay was further precipitated by Hurricane Katrina and its aftermath, there must be some additional showing that the State did more to hinder trial of these defendants. *42 To quash the indictment as to Thomas and Patín, when the basis is that not only the State was responsible, constitutes clear error.
We therefore reverse our previous writ disposition affirming the district court’s granting of the motions to quash the indictments of Thomas and Patín, and remand the matter to the district court to reinstate the charges of second degree murder as to both defendants. We further order that the trial as to these defendants 174commence within forty-five (45) days of the date of this Court’s Per Curiam, issued on June 17, 2010.[51] Furthermore, since there is no indication that bond was set as to either defendant, we find that Thomas and Patín are entitled to a bond hearing. The district court is ordered to conduct a bond hearing and to set an appropriate bond for the defendants forthwith.

DECREE

We reverse the judgment of the district court which granted the motions to quash filed by Eugene Thomas and Morris Patín. We further remand the matter to the district court and order the district court to commence the trials of Eugene Thomas and Morris Patín within forty-five days (45) of the date of our Per Curiam. Further, we order that the district court conduct a bond hearing on the amended charge of second degree murder.
REVERSED AND REMANDED.
ARMSTRONG, C.J., Concurs in the Result.
MURRAY, J., Concurs in the Result.
McKAY, J., Concurs in the Result.
TOBIAS, J., Concurs in the Result and Assigns Reasons.
LOMBARD, J., Dissents.
BELSOME, J., Dissents with Reasons.
BONIN, J., Concurs with Reasons.

. Mr. Green and Mr. Steen survived their wounds, but Mr. Green is now deceased.

. In the meantime, the district court granted a motion to quash the indictment filed by McCormick as to his charge based on the time limitations for the institution of prosecution set forth in the Code of Criminal Procedure. McCormick was subsequently released from custody. The State moved for an appeal, but the appeal was rendered moot when McCormick was murdered.

. Hurricane Katrina made landfall prior to the September 12, 2005 trial date.

. In its brief, the State argues that court operations did not resume at the Criminal District Court until June 6, 2006.

. See footnote No. 2 referencing the murder of McCormick, which occurred around this time.

. The district court granted the motion for severance on November 19, 2009.

. Later, a separate appeal was docketed in State v. Patin.

. The Baton Rouge Capital Conflict Office is represented by acronym, BRCCO throughout this opinion.

. As noted above, Thomas preserved this issue in his writ application, which was remanded to this court for consideration with the appeal of the State in his case. His writ application was consolidated with the appeal by the State,

. The Sixth Amendment of The United States Constitution, entitled Jury trials for crimes, and procedural rights provides:
In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall'have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

. The four Barker factors are discussed at length below.

. See, e.g., United States v. Simmons, 338 F.2d 804, 807 (C.A.2 1964), cert. denied, 380 U.S. 983, 85 S.Ct. 1352, 14 L.Ed.2d 276 (1965).

. Footnotes and citations omitted.

. Footnotes and citations omitted.

. Footnotes and citations omitted.

. Footnotes and citations omitted.

. Footnotes and citations omitted.

. Footnotes and citations omitted.

. The Supreme Court noted as to the third Barker factor, Doggett did timely assert his right to speedy trial.

. Citations omitted.

. Citation omitted.

. Footnote omitted

.Footnotes omitted.

. Footnotes omitted.

. The State’s argument as to Patin shall be discussed later in this opinion.

. Brillon, is discussed supra.

. See, State v. Buckley, 2002-1288, p. 3 (La.App. 3 Cir. 3/5/03), 839 So.2d 1193, 1196 citing State v. Morris, 99-3235, p. 1 (La.2/18/00), 755 So.2d 205, See also, State v. McDonald, 30, 854, pp. 4-5 (La.App. 2 Cir. 8/19/98), 718 So.2d 542, 545.

. See, State v. Rome, 93-1221, 630 So.2d 1284, 1286 (La. 1/14/94).

. Id.

.Thomas cites to: State v. Lathers, 2005-0786, p. 8 (La.App. 1 Cir. 2/10/06), 924 So.2d 1038, 1043 (citing State v. Morris, 99-3235, p. 1 (La.2/18/00), 755 So.2d 205 (per curiam)); writ denied 2006-1036, (La. 11/3/06), 940 So.2d 659.)

. See State v. Brooks, 2002-0792, pp. 7-8 (La.2/14/03), 838 So.2d 778, 783.

. See State v. Elfert, 247 La. 1047, 1051-52, 175 So.2d 826, 828 (1965).

. See State v. Campbell, 97-0358, p. 13 (La.App. 4 Cir. 5/20/98), 715 So.2d 488, 495.

. See State v. Fabacher, 362 So.2d 555, 556 (La.1978).

. See State v. Odom, unpub. 07-0580 (La.App. 4 Cir. 11/14/07), 968 So.2d 357.

. See State v. Gladden, 260 La. 735, 744, 257 So.2d 388, 391 (1972).

. See State v. Williams, 2006-1150, p. 5 (La.App. 4 Cir. 1/24/07), 951 So.2d 1158, 1161.

. Hamilton held that quashing the State's bill of information was not warranted based upon speedy trial considerations. Furthermore, this Court found that the trial date was postponed as result of effects of Hurricane Katrina, thus the State was prevented from trying the defendant on scheduled date, and for some time thereafter while criminal district court was not in operation. It was therefore unnecessary to determine exactly when causes preventing State from trying the defendant were removed or when a jury could have been seated because the motion to quash was granted within two years of anniversary of the hurricane, and at the time the district court granted the motion to quash, the State still had approximately five months and three weeks to bring its case against defendant to trial. Id., 2007-0582, p. 8 (La.App. 4 Cir. 11/28/07), 973 So.2d at 114.

. Gladden, 260 La. at 744, 257 So.2d at 391.

. See State v. Gibson, 2007-0530, p. 5 (La.App. 4 Cir. 10/24/07), 971 So.2d 389, 393.

.This Court notes that Thomas filed a motion for speedy trial in the early part of 2005, and asserted his right to speedy trial once again after Hurricane Katrina.

.After the court heard arguments in this matter, en banc, the State filed "Notice” to this Court in which it listed an address based on a current copy of Ms. Placide’s Louisiana driver’s license. However, this Court notes that since Ms. Placide has been aware of the prosecution of the defendants herein since prior to Hurricane Katrina, that she has chosen to remain unavailable.

. The State argues that "Crystal Placide was unavailable then; she is unavailable now."

. The coindictee is Thomas’ brother, Morris Patin.

. La.C.Cr.P. art. 342. Increase or reduction of bail; sufficiency of security, provides:
The court having trial jurisdiction over the offense charged, on its own motion or on motion of the state or defendant, for good cause may either increase or reduce the amount of bail, or require new or additional security. For purposes of this Article, good cause for increase of bail specifically includes but is not limited to the rearrest of the defendant on offenses alleged to have been committed while out on bond. However, in any parish with a population in excess of four hundred ninety thousand, as established by the 1990 U.S. Decennial Census, the district court shall hold a contradictory hearing prior to a modification of the bail order. The modification of any bail order wherein a bail bond has been posted by a criminal defendant and his sureties shall upon said modification terminate the liability of the defendant and his sureties under the previously existing bail contract. A new bail must be posted in the amount of the new bail order.

. In Thomas' 2009 writ, a panel of this court found that the eight-year delay was presumptively prejudicial. The panel in Patin's writ did not make this finding.

. Writ denied 2009-2369 (La.4/30/10), 34 So.3d 280.

. It is unclear if this was a statement to the police or a statement to Mr. Reed.

. The address is taken from a police report horn McCormick’s arrest.

. La.C.Cr. Proc. art. 538. Effect of sustaining motion to quash, provides:
The court shall order the defendant discharged from custody or bail, as to that charge, when it sustains a motion to quash based upon the ground that:
(1)The offense is not punishable under a valid statute;
(2) Trial for the offense charged would constitute double jeopardy;
(3) The time limitation for the institution of prosecution or for the commencement of trial has expired; or
(4) The court has no jurisdiction of the offense charged.
*41 In other cases, when a motion to quash is sustained, the court may order that the defendant be held in custody or that his bail be continued for a specified time, pending the filing of a new indictment.

. On July 2, 2010, this Court received notice of compliance from the State that pursuant to this Court's June 17, 2010 Per Curiam, trial has been scheduled to commence as to defendant Thomas for Juiy 19, 2010. The trial of Patin is scheduled to commence on July 26, 2010.